PER CURIAM.
The State of Alabama, on relation of the Alabama Policy Institute (“API”), the Alabama Citizens Action Program (“ACAP”), and John E. Enslen, in his official capacity as Judge of Probate for Elmore County, seeks emergency and other relief from this Court relating to the issuance of marriage licenses to same-sex couples. Named as respondents are Alabama Probate Judges Alan L. King (Jefferson County), Robert M. Martin (Chilton County), Tommy Rag-land (Madison County), Steven L. Reed (Montgomery County); and “Judge Does ## 1-63, each in his or her official capacity as an Alabama Judge of Probate.” API and ACAP ask on behalf of the State for “a clear judicial pronouncement that Alabama law prohibits the issuance of marriage licenses to same-sex couples,” To the same end, Judge Enslen “requests that this Supreme Court of Alabama, by any and all lawful means available to it, protect *500 and defend the sovereign will of the people of the State of Alabama.”
Chapter 1 of Title 30, Ala.Code 1975, provides, as has its predecessor provisions throughout this State’s history, a comprehensive set of regulations governing what these statutes refer to as “marriage.” See, e.g., § 30-1-7, Ala.Code 1975 (providing for the solemnization of “marriages”), and § 30-1-9, Ala.Code 1975 (authorizing probate judges to issue “marriage” licenses). In 1998, the Alabama Legislature added to this chapter the “Alabama Marriage Protection Act,” codified at § 30-1-19, Ala.Code 1975 (“the Act”), expressly stating that “[m]arriage is inherently a unique relationship between a man and a woman” and that “[n]o marriage license shall be issued in the State of Alabama to parties of the same sex.” § 30-l-19(b) and (d), Ala.Code 1975. In 2006, the people of Alabama ratified an amendment to the Alabama Constitution known as the “Sanctity of Marriage Amendment,” § 36.03, Ala. Const. 1901 (“the Amendment”), which contains identical language. § 36.03(b) and (d), Ala. Const. 1901. The petitioner here, the State of Alabama, by and through the relators, contends that the respondent Alabama probate judges are flouting a duty imposed upon them by the Amendment and the Act and that we should direct the respondent probate judges to perform that duty.[1]
The circumstances giving rise to this action are the result of decisions and orders recently issued by the United States District Court for the Southern District of Alabama (“the federal district court”) in Searcy v. Strange, 81 F.Supp.3d 1285 (S.D.Ala.2015) (“Searcy I”), and Strawser v. Strange (Civil Action No. 14-0424-CG-C, Jan. 26, 2015), and a subsequent order by that court, in each of those cases, refusing to extend a stay of its initial order pending an appeal. [1]
In its initial decision in Searcy I, the federal district court issued a “Memorandum Opinion and Order” in which that court came to the conclusion that the “prohibition and non-recognition of same-sex marriage” in the Amendment and the Act violate the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In Searcy I, the federal district court enjoined Alabama Attorney General *501 Luther Strange — the only remaining defendant in that action — from enforcing the Amendment and the Act.
On January 26, the federal district court entered a preliminary injunction in Straw-ser, a case in which a same-sex couple had been denied a marriage license in Mobile. The federal district court, relying on the reasons it provided in Searcy I for the unconstitutionality of the Amendment and the Act, enjoined Attorney General Strange and “all his officers, agents, servants and employees, and others in active concert or participation with any of them” from enforcing “the marriage laws of Alabama which prohibit same-sex marriage.”
In the wake of the federal district court’s orders, Attorney General Strange has refrained from fulfilling what would otherwise have been his customary role of providing advice and guidance to public officials, including probate judges, as to whether or how their duties under the law may have been altered by the federal district court’s decision. Similarly, consistent with the federal district court’s order, Attorney General Strange has refrained from taking any other official acts in conflict with those orders.
On January 28, 2015, the federal district court issued an “Order Clarifying Judgment” in Searcy I, in which it responded to “statements made to the press by the Alabama Probate Judges Association” that indicated that, “despite [the federal district court’s] ruling, [probate judges] must follow Alabama law and cannot issue marriage licenses to same-sex couples.” In that order, the federal district court observed that
“ ‘[reasonable people can debate whether the ruling in this case was correct and who it binds. There should be no debate, however, on the question whether a clerk of court may follow the ruling, even for marriage-license applicants who are not parties to this case. And a clerk who chooses not to follow the ruling should take note: the governing statutes and rules of procedure allow individuals to intervene as plaintiffs in pending actions, allow certification of plaintiff and defendant classes, allow issuance of successive preliminary injunctions, and allow successful plaintiffs to recover costs and attorney’s fees— The preliminary injunction now in effect thus does not require the Clerk to issue licenses to other applicants. But as set out in the order that announced issuance of the preliminary injunction, the Constitution requires the Clerk to issue such licenses. As in any other instance involving parties not now before the court, the Clerk’s obligation to follow the law arises from sources other than the preliminary injunction.’” ,
(Quoting Brenner v. Scott (No. 4:14cv107, Jan. 1, 2015) (N.D.Fla.) (emphasis added).)
The federal district court entered stays of the execution of its injunctions in Searcy I and Strawser until February 9, 2015, in order to allow Attorney General Strange to seek a further stay, pending appeal, from the United States Court of Appeals for the Eleventh Circuit; On February 3, 2015, the Eleventh Circuit declined Attorney General Strange’s request for a stay. Thereafter, Attorney General Strange sought a stay from the United States Supreme Court. On February 9, 2015, the United States Supreme Court also declined to enter a stay over a strongly worded dissent from Justice Clarence Thomas that was joined by Justice Antonin Sealia; Strange v. Searcy, — U.S. —, 135 S.Ct. 940, 191 L.Ed.2d 149 (2015).
On February 8, 2015, the Chief Justice of this Court entered an administrative order stating that the injunctions issued by the federal district court in Searcy I and Strawser were not-binding on any Ala *502 bama probate judge and prohibiting any probate judge from issuing or recognizing a marriage license that violates the Amendment or the Apt.
On February 9, 2015, the stays of the injunctions in Searcy I and Strawser were lifted. It is undisputed that at that time respondent probate Judges King, Martin, Ragland, and Reed began issuing marriage licenses to same-sex couples in their respective counties. Probate judges in' some other counties refused to issue any marriage licenses, pending some further clarification concerning their duty under the law. Still other probate judges .continued to issue marriage licenses to opposite-sex couples and refused to issue marriage licenses to same-sex couples.
Also on February 9, 2015, the plaintiffs in Searcy I filed a motion seeking to hold Mobile Probate Judge Don Davis in contempt for “failing] to comply with [the federal district court’s] January 23, 2015 Order.” The federal district court denied the motion, stating:
“Probate Judge. Don Davis is not a party in this case and the Order of January 23, 2015, did not directly order [Judge] Davis to do anything. Judge Davis’s obligation to follow the Constitution does not arise from this court’s Order. The Clarification Order • noted that actions against Judge Davis or others who fail to follow the Constitution could be initiated by persons who are harmed by their failure to follow.the law. However, no such action is before the Court at this time.”
(Footnote omitted.)
On February 10, 2015, the federal court granted the plaintiffs’ motion in Strawser to amend their complaint to add three additional same-sex couples as plaintiffs and to add Judge Davis as a defendant. On February 12, 2015, the federal district court entered an order requiring Judge Davis to issue marriage licenses to each of the four couples named as plaintiffs in that case.
As noted, on February 11, 2015, API and ACAP filed their petition. On February 13, 2015, this Court ordered answers and briefs in response to the petition, “as to the issues raised by the petition, including, but not limited to, any issue relating to standing or otherwise relating to this Court’s subject-matter jurisdiction, and any issue relating to the showing necessary for temporary relief as requested in the petition.” On February 18, 2015, the named respondent probate judges and Probate Judges Don Davis and John E. Enslen filed-their respective responses to the petition.
In his response, Judge Davis “moved this ... Court to enter an Order that the Emergency Petition for Writ of Mandamus filed on February 11, 2015, with this Court does not apply to [him] due to changing circumstances that are not reflected in the Mandamus Petition.” He states that the petition does not apply to him because he is a defendant, in his official capacity as probate judge, in Strawser, and he has been “enjoined from refusing to issue marriage licenses to the plaintiffs [in that case] due to the Alabama laws which prohibit same-sex marriage.”
.For his part, Judge Enslen stated in his response that he “has thus far refused to issue same sex marriage licenses.” Judge Enslen expressly requested that this Court “by any and all lawful means available to it, protect and defend the sovereign will of the people of the State of Alabama as expressed in the Constitution of the State of Aabama, as amended.” We treat Judge Enslen’s response as a motion to join this proceeding in the place of one of the “Judge Doe” respondents, and we grant that motion.
*503 Also, in light of the fact that the legal positions of API, ACAP, and respondent Judge Enslen are clearly aligned, we hereby modify the record to reflect that alignment.[2] Judge Enslen has been realigned as an additional relator seeking an order from this Court requiring, among other things,, that Alabama probate judges continue to perform their duty in accordance with Alabama law. API, ACAP, and En-slen are hereinafter collectively referred to as “the relators.”
The relators assert that Alabama’s probate judges have a ministerial duty to follow Alabama law limiting marriage to a union of one man and one woman. In contrast, the respondents contend that granting the relief the relators request necessarily would require this Court to determine the validity of that law when tested against the United States Constitution because there would be no ministerial duty of the nature asserted if the law is unconstitutional. -, , .
The ministerial duty of probate judges in Alabama is, of course, a function of Alabama law, which probate judges swear by oath to support, except to the extent that that duty may be altered or overridden by the United States Constitution, to which they likewise swear an oath. Before the federal district court issued its decisions in Searcy I and Strawser, the named respondents and all other probate judges in this State were performing their ministerial duty in accordance with the express provisions of the Act and the Amendment. They did so even though numerous federal courts had already declared other states’ laws limiting marriage to opposite-sex couples to be unconstitutional. See, e.g., Bostic v. Schaefer, 760 F.3d 352 (4th Cir.2014); Baskin v. Bogan, 766 F.3d 648 (7th Cir.2014); Latta v. Otter, 771 F.3d 456 (9th Cir.2014); and Kitchen v. Herbert, 755 *504 F.3d 1193 (10th Cir.2014). The respondents stopped following Alabama law, however, following the Searcy I and Strawser decisions. Clearly, the respondents, who were not bound by the federal district court’s decision, assumed a new position as to the nature of their duty in accordance with the position taken by the federal district court. Therefore, in order to determine whether the respondents are correct to now treat their ministerial duty as being altered or overridden by the United States Constitution, we must examine the reasoning of the federal district court’s decision in Searcy I, which triggered their change of position. Absent our doing so, we cannot resolve the dispute that exists in this adversarial proceeding; we cannot provide the relators the relief that they request and that the respondents oppose. It would not be enough for this Court merely to order that the respondents “follow their ministerial duty.” Such an order would beg the question whether they are or are not doing so at the present time, the very question the parties contest. Accordingly, in order to resolve the dispute before us and to discharge the supervisory duties and responsibilities imposed upon this Court by law, we must address that question.
I. The Significance and Meaning of Marriage
The family is the fundamental unit of society. Marriage is the foundation of the family. There is' no institution in a civilized society in which the public has any greater interest,
“The contract of marriage is the most important of all human transactions. It is the very basis of the whole fabric of civilized society.”
Joseph Story, Commentaries on the Conflict of Laws Foreign and Domestic § 109 (3d ed. 1846).
“[Marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.”
Maynard v. Hill, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888). It “creat[es] the most important relation in life, ... having more to do with the morals and civilization of a people than any other institution.” Id. at 205.
“ ‘[Marriage] is not then a contract within the meaning of the clause of the constitution which prohibits the impairing the obligation of contracts. It is rather a social relation like that of parent and child, the obligations of which arise not from the consent of concurring minds, but are the creation of the law itself, a relation the most important, as affecting the happiness of individuals, the first step from barbarism to' incipient civilization, the purest tie of social life, and the true basis of human progress.’ ”
Id. at 211-12 (quoting Adams v. Palmer, 51 Me. 480, 484-85 (1863)).
“[M]arriage is a contract" sui generis, and the rights, duties, and obligations which arise out of it, are matters of so much importance to the well-being of the State, that they are regulated, not by private contract, but by the public laws of the State, which are imperative on all, who are domiciled within its territory.”
Story, supra, at § 111.
• According to one observer, marriage is a “prepolitical” “natural institution” “not created by law,” but nonetheless recognized and regulated by law in every culture and, properly understood, an institution that must be preserved as a public institution based on the following rationale: “The family is the fundamental unit of society_ [F]amilies ... produce some *505 thing that governments need but, on their own, they could not possibly produce: upright, decent people who make honest law-abiding, public-spirited citizens. And marriage is the indispensable foundation of the family.” Robert P. George, Law and Moral Purpose, First Things, Jan. 2008; see also Sherif Girgis, Robert P. George & Ryan T. Anderson, What is Marriage?, 34 Harv. J.L. & Pub. Pol’y 245, 270 (2011) (discussing the bases for laws supporting “conjugal” or - “traditional” marriage and noting that “[m]arriages ... are a matter of urgent public interest, as the record of almost every culture attests — worth legally recognizing and regulating. Societies rely on families, built on strong marriages, to produce what they need but cannot form on their own: upright, decent people who make for reasonably conscientious, law-abiding citizens. As they mature, children benefit from the love and care of both mother and father, and from the committed and exclusive love of their parents for each other.... ’ In the absence of a flourishing marriage culture, families often fail to form, or to achieve and maintain stability.”).
Thus it is for the stability and welfare of society, for the general good of the public, that a proper understanding and preservation of the institution of marriage is critical. It is the people themselves, not the government, who must go about the business of working, playing, worshiping, and raising children in whatever society, whatever culture, whatever community is facilitated by the framework of laws that these same people, directly and through their representatives, choose for themselves. It is they, who on a daily basis must interact with their fellow man and live out their lives within that framework, who are the real stakeholders in that framework and in the preservation and execution of the institutions and laws that form it. There is no institution more fundamental to that framework than that of marriage as properly understood throughout history.
In .1885, the United States Supreme Court expressed the axiomatic nature of marriage as follows:
“[N]o legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the coordinate states of the Union, than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement.”
Murphy v. Ramsey, 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 (1885). See, also, Smith v. Smith, 141 Ala. 590, 592, 37 So. 638, 638-39 (1904), describing marriage as “the sacred relation.” Even in decisions suggesting that marriage is simply a “civil status,” courts have recognized “the fair point that same-sex marriage is unknown to history and tradition.” Windsor v. United States, 699 F.3d 169, 188 (2d Cir.2012). As the United States Supreme Court acknowledged in United States v. Windsor, — U.S. —, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013):
“It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its *506 role and function throughout the history of civilization.”
— U.S. at -, 133 S.Ct. at 2689 (also noting that “[t]he limitation of lawful marriage to heterosexual couples ... for centuries had been deemed both necessary and fundamental,” id.),
“It is beyond dispute, as the Court of Appeal majority in this case persuasively indicated, that there is no deeply rooted tradition of same-sex marriage, in the nation or in this state. Precisely the opposite is true. The concept of same-sex marriage was unknown in our distant past, and is novel in our recent history, because the universally understood definition of.marriage has been the legal or religious union of a man and a woman.”
In re Marriage Cases, 43 Cal.4th 757, 866, 183 P.3d 384, 460, 76 Cal.Rptr.3d 683, 773 (2008) (Baxter, J., concurring in part and dissenting in part) (footnote omitted).[3]
From its earliest days, Alabama has recognized so-called common-law marriages. See, e.g., Campbell’s Adm’r v. Gullatt, 43 Ala. 57, 69 (1869) (“[A] marriage good at the common law, is to be held a valid marriage in this State.”). Also from its earliest days, the State has by legislation provided a statutory scheme for the formal licensing and recognition of marriages by the State. H. Toulmin, Digest of the Laws of Alabama, tit. 42, ch. 1, § 1 (1823). The present statutorily prescribed scheme for the licensing and solemnization of marriages is found in Chapter 1 of Title 30, Ala.Code 1975. Further, both the caselaw and the statutory law of Alabama incorporate or contemplate the institution of marriage in many areas.
The meaning and significance of marriage as an institution, as prescribed or recognized throughout all of these statutes and all of Alabama’s decisional laws, reflects the truths described above: that marriage, as a union between one man and one woman, is the fundamental unit of society.
As the Alabama Supreme Court stated in 1870:
“Archbishop Rutherford, one of the most able and eminent of the commentators on Grotius, has placed marriage among the natural rights of men. He defines it in these words: ‘Marriage is a contract between a man and woman, in which, by their mutual consent, each acquires a right in the person of the other, for the purpose of their mutual happiness and for the production and education of children. Little, I suppose, need be said in support of this definition, as nothing is affirmed in it, but what all writers upon natural law seem to agree in.’ — Ruthf. Insts. of Nat; Law, p. 162; 1 Bish. on Mar. and Div. § 3, 29; 2 Kent, 74, 75; 6 Bac. Ab'r. - Bouv. p. 454; 2 Bouv. Law Diet. 12th ed. p. 105,
“Mr. Parsons, referring to the same subject, in a late work of the highest *507 authority, uses like language. He declares that ‘the relation of marriage is founded on the will of God, and the nature of man; and it is the foundation of all moral improvement, and all true happiness. No legal topic surpasses this in importance; and .some of the questions which it suggests are of great difficulty.’ — 2 Pars, on Contr. p. 74.”
Goodrich v. Goodrich, 44 Ala. 670, 672-75 (1870).
II. This Court’s Authority And Responsibility To Act

A. This Court Has Subject-Matter Jurisdiction

As discussed, the federal district court’s order in Searcy I enjoined Attorney General Strange from enforcing the Amendment and the Act, thus effectively preventing the Attorney General from giving much needed advice to Alabama’s probate judges as to their legal duties under the law. The federal district court’s order in Strawser specifically relied upon the legal reasoning set out in Searcy I. Neither order specifically discusses or analyzes the remainder of Chapter 1 of Title 30. Neither order analyzes the import of its approach to the term “marriage” for such related terms as “husband,” “wife,” “spouse,” “father,” and “mother” so entrenched in much of the caselaw and other statutory law of this State. See discussion infra. The probate judges of this State, in both, their judicial and ministerial capacities, continue to be bound by that caselaw and by those statutes. Furthermore, 67 of this State’s 68 probate judges are not the subject" of any restraint by the federal district court, including as to the interpretation and application of the Act and the Amendment. ¡
Yet there is the federal district court decision. And, in the wake of that decision, the refusal of the federal district court to stay that decision and the unavailability of the Attorney General as a source of guidance, uncertainty has become the order ' of the day. Confusion reigns. Many judges, including the respondents, are issuing marriage licenses to both same-sex couples and opposite-sex couples. Others are issuing no marriage licenses at all. Still others, like relator Judge Enslen, are issuing marriage licenses only to opposite-sex couples. There is no order or uniformity of practice.
But the problems that lie before us are not limited to the confusion and disarray in the ministerial act of licensing marriages. If the same-sex marriage licenses being issued by respondents and other probate judges are given effect by those judges and their colleagues in other circuits throughout the State, this will work an expansive and overnight revolution in countless areas of caselaw and statutory law that incorporate or contemplate the traditional definition of marriage. To name but a few examples, there is caselaw and/or statutory law that presumes, accommodates, or contemplates man-woman marriage in such wide-ranging areas as the laws of inheritance and the distribution of estates, the administration of estates, postmarital support, custodial and other parental rights as to children, adoption of children,[4] dissolution of marriages, testi *508 monial privileges in both the civil and criminal law, certain defenses in the criminal law, interests in land, the conveyance and recording of such interests, compensation for the loss of consortium, and the right to statutory or contractual benefits of many types. Indeed, most of the matters falling within the jurisdiction of the probate courts involve rights that are affected by marital status because of the rights of a spouse or legal preferences given to a spouse or parent.
Section 12-13-1, Ala.Code 1975, states, in part:
“(b) The probate court shall have original and general jurisdiction over the following matters:
“(1) The probate of wills.
“(2) The granting of letters testamentary and of administration and the repeal or revocation of the same.
“(3) All controversies in relation to the right of executorship or of administration.
“(4) The settlement of accounts of executors and administrators.
“(5) The sale and disposition of the real and personal property belonging to and the distribution of intestate’s estates.
“(6) The appointment and removal of guardians for minors and persons of unsound mind.
“(7) All controversies as to the right of guardianship and the settlement of guardians’ accounts.
“(8) The allotment of dower in land in the cases provided by law.”
Without a clear understanding as to whether a marriage exists, how is a probate court to know whether a same-sex partner must be served with process as a surviving spouse for purposes of a petition to probate a deceased partner’s will; how is the probate court to know whether a same-sex partner has a priority right, as a surviving spouse, to appointment as administrator of a deceased partner’s estate; how is the probate court to know whether a deceased partner has the right of a surviving spouse to an intestate share of the estate, or to homestead allowance, to exempt property, to family allowance, or to other rights of a surviving spouse; and how is the probate court to determine priority rights as to the appointment of guardians and conservators?
And the problems will not be confined to probate courts. Circuit courts must assess marital status in regard to whether to grant a petition for a legal separation or a divorce and in making property divisions *509 and alimony awards. And marital status is part of our law concerning the legitimation of children and paternity, including presumptions as to married persons to whom a child is born, a matter that affects both circuit courts and juvenile courts. Likewise, circuit courts will be confronted with claims of loss of consortium and wrongful-death claims brought on behalf of the heirs of decedents, and all trial courts will have to assess the applicability of evi-dentiary privileges belonging to a spouse.
The Governor of Alabama recently highlighted in an amicus brief to the United States Court of Appeals for the Eleventh Circuit (filed in support of Attorney General Strange’s request for a stay of the order in Searcy I) some of the laws and practices that potentially would, be affected by a redefinition of marriage:
“[A]ll of the statutes governing marital and domestic relations, Ala.Code Title 30, and the judicial decisions interpreting them; the presumption of paternity, Ala.Code § 26-17-204, and other rules for establishment of the parent-child relationship, Ala.Code § 26-17-201; laws governing consent to adopt, Ala.Code § 26-10A-7(3), and all other laws governing adoption, Ala.Code Title 26, Chapter 10A; termination of parental rights, Ala.Code § 12-15-319; all laws that presuppose different people occupying the positions of ‘father,’ ‘mother,’ ‘husband,’ and ‘wife,’ e.g., Ala.Code § 40-7-17; laws governing intestate distribution, the spousal share, Ala.Code § 43-8-41, and the share of pretermit-ted children, Ala.Code § 43-8-91; legal protections for non-marital children, Ala. Code § 26-17-202; registration of births, Ala.Code § 22-9A-7, J.M.V. v. J.K.H., 149 So.3d 1100 (Ala.Civ.App.2014); conflict-of-interest rules and other ethical standards prohibiting marital relations, Ala.Code § 45-28-70(f)(l), Cooner v. Alabama State, 59 So.3d 29 (Ala.2010); and laws presupposing biological kin relations, Ala.Code § 38-12-2.
“This does not include laws governing forms issued by the State that identify mothers, fathers, husband, or wife; tax laws; education curricula; accreditation standards for educational institutions; licensing standards for professions; public accommodations rules; religious liberty protections; health care regulations; and many other areas of law. What are children to be taught in Alabama’s schools about the nature of marriage? How will it be defined in textbooks and other instructional materials? Will all private schools, colleges, arid universities be required to go along with the new definition, whatever it is? Will there be moral or religious exemptions for those who perceive inherent differences between marital unions and non-marital unions?”
Every day, more and more purported “marriage licenses” are being issued to same-sex couples by some of the probate judges in this State. Every day, the recipients of those licenses and others with whom they interact may be, and presumably are, relying upon the validity of those licenses in their personal and business affairs. Every probate judge in this State, regardless of his or her own stance on the issuance of such licenses, will soon enough be faced, in his or her judicial capacity, with a universe of novel derivative questions unprecedented in their multiplicity, scope, and urgency. The circuit courts of this State will confront a similar experience.
The probate judges of this State are members of the judicial branch of government. Accepting the position suggested by all relators and respondents, that insofar as their execution of the authority to *510 issue marriage licenses they function not as courts of inferior jurisdiction, but as executive ministers of the law, the fact remains that each probate judge in this State also functions as a “court of inferior jurisdiction” with responsibility to administer the law in many types of cases. Their ability to do so with any semblance of order and uniformity, with due regard for the lives their decisions impact, and with respect for the law and the constitutions of this State and of the United States, which they have sworn an oath to uphold, is in peril. Indeed, given the disparate views of the law held among these judges, and no doubt the circuit judges as well, we see no way for there to be uniform and evenhanded application of the law among the circuits of this State unless and until this Court speaks.
Section 140(b), Ala. Const.1901, states that this Court “shall have original jurisdiction ... to issue such remedial writs or orders as may be necessary to give it general supervision and control of courts of inferior jurisdiction.” Section 12-2-7(3), Ala.Code 1975, echoes § 140, stating that “[t]he Supreme Court shall have authority ... [t]o issue writs of injunction, habeas- corpus, and such other remedial and original writs as are necessary to give to it a general superintendence and control of courts of inferior jurisdiction.” A separate provision of § 12-2-7, subsection (2), provides the following jurisdiction to the Supreme Court: “To exercise original jurisdiction in the issue and determination of writs of quo warranto and mandamus in relation to matters in which no other court has jurisdiction.”
Alabama is not alone in its adoption of provisions such as those cited above. “Constitutional or statutory provisions expressly granting to various courts superintending control over inferior tribunals are common, although not universal, in the states of this country.” P.V. Smith, Annotation, Superintending Control Over Inferior Tribunals, 112 A.L.R. 1351, 1352 (1938). The language used by most states in granting courts this power is very similar to the language found in Alabama’s Constitution. Generally, concerning the origin of the superintending control over inferior tribunals, Smith states:
“The following conclusion was drawn by the annotator in 51 L.R.A. 33, loe. cit. p. Ill: ‘The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. And, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted.’ ”
112 A.L.R. at 1356 (emphasis added). Further,
“[i]n Kelly v. Kemp (1917) 63 Okla. 103, 162 P. 1079, in regard to the constitutional provision vesting the Supreme Court with a general superintending control over inferior tribunals, the court said: ‘This provision placed the Supreme Court in practically the same position with reference to the inferior courts of the State, as that occupied by the court of King’s Bench to the inferior courts of England under the common law, which court, as stated by Blackstone, was vested with power to keep all inferior couHs within the bounds of their authority and, to do this, could remove their proceedings to be deter *511 mined by it, or prohibit their progress below (3 Bl. Com. 42), and that court was also possessed of authority to enforce in inferior tribunals the due exercise of those judicial or ministerial powers which had been vested in them, by restraining their excesses and quickening their negligence and obviating their denial of justice (2 Bl. Com. 111).’ ”
112 A.L.R. at 1356-57 (emphasis added).
“The power of superintending control is not limited by forms of procedure or by the writ used for its exercise.” 112 A.L.R. at 1357.
“Accordingly, in State v. Long (1911) 129 La. 777, 56 So. 884, where it was argued as to the conditions under which writs of certiorari, mandamus, and prohibition might issue, the Supreme Court said that, in the exercise of its supervisory powers, it was not tied down by the provisions of the Code of Practice regarding such writs.
“And in Thomas v. Doughty (1927) 163 La. 213, 111 So. 681, the Supreme Court said: ‘This court, in the exercise of its general supervision and control over inferior courts, is not tied down, by forms of procedure, and will look at the substance of the right sought to be vindicated and the need for speedy relief, rather than to the form in which such relief is sought.’
“In Dinsmore v. Manchester (1911) 76 N.H. 187, 81 A. 533, in answer to an objection to the scope of review by the Supreme Court on certiorari under its statutory general superintendence of all inferior tribunals, the court said that it was unimportant that the proceeding was called ‘certiorari,’ and that ‘the superintending power of the court over inferior tribunals does ndt depend upon, and is not limited by, technical accuracy of designation in legal forms of action.’
“And in Lowe v. District Ct. (1921) 48 N.D. 1, 181 N.W. 92, the Supreme Court said that the nature and extent of its superintending control are ‘not reflected by the name of the writ that has been used for its exercise.’ ”
112 A.L.R. at 1357-58 (emphasis added). See also Thompson v. Lea, 28 Ala. 453, 463 (1856) (Rice, C.J.) (noting that this Court’s appellate jurisdiction and its superintending control over inferior tribunals are “distinct things, and must not be confounded” and stating that “ ‘[a] general superintendence and control of inferior jurisdictions’ is, by the constitution, granted to this court unconditionally. ‘Appellate jurisdiction’ is, by the very terms of the grant, subjected to ‘such restrictions and regulations, not repugnant to this constitution, as may, from time to time, be prescribed by law.’ ” (emphasis added)).
“The generally accepted view is that a court will exercise its superintending control over inferior tribunals only in extreme cases and under unusual circumstances.” Smith, 112 A.L.R. at 1373. This sentiment is consistent with our Court’s precedent. In Ex parte Alabama Textile Products Corp., 242 Ala. 609, 613, 7 So.2d 303, 306 (1942), this Court exercised jurisdiction over an original action on the ground that the Montgomery Circuit Court could not provide the complete relief necessary, observing that
“the higher court will not take jurisdiction where the application can be made to a lower court, unless for special reasons complete justice cannot otherwise be done, as where the case is of more than ordinary magnitude and importance to prevent a denial of justice or where no application can be made to the lower court in time to prevent the consummation of the alleged wrong.”
See also Roe v. Mobile Cnty. Appointment Bd., 676 So.2d 1206 (Ala.1995), overruled *512 on other grounds by Williamson v. Indianapolis Life Ins. Co., 741 So.2d 1057 (1999), in which this Court relied upon the unified nature of our court system and the supervisory authority granted to it under what is now § 140 of our constitution to “reach down” and “pull up” to it the record in a still pending lower court proceeding in order to create a framework for its assessment of a related matter.
The respondents’ - briefs focus on Alabama Textile and make three arguments as to why the holding in that case does not support jurisdiction in this Court over the present matter. First, the, respondents argue that Alabama Textile-involved a petition for a writ of certiorari rather than a petition for a writ of mandamus. The respondents give no explanation, and cite no authority, as to how or why this makes a difference. We cannot see that it does.
Second, the respondents argue that the Court in Alabama Textile determined that it should exercise jurisdiction “because all parties consented to the jurisdiction of the Supreme Court.” This assertion is incorrect. Parties cannot vest this Court with jurisdiction by agreeing that it has jurisdiction. 242 Ala. at 612, 7 So.2d at 305 (“[Tjhis Court can only act within the jurisdiction conferred by law, and this cannot be enlarged by waiver or the consent of the parties.”). And the parties did not do so in Alabama Textile. What they did agree to do was to waive the necessity of a writ of certiorari calling up the case for review. But the issue of a formal writ of certiorari is irrelevant here because the present case comes to us as a petition for a writ of mandamus or similar relief. The case therefore is already before us without the necessity of our calling it up from some lower court.[5]
The third and final argument of the respondents — which they refer to as their “most important!] argument” — is as follows: The holding of Alabama, Textile has been recognized in subsequent cases, but only as dicta. The fact that Alabama Textile, itself, held as it did, however, is in itself sufficient precedent for the action taken by this Court today. In any event, one would expect that extraordinary circumstances justifying this Court’s action, rather than action by a circuit court, would be rare. In addition, as the respondents themselves note, the principle recognized by this Court in Alabama Textile has in fact been reiterated by this Court on several occasions, including in this Court’s decision in Ex parte Tubbs, 585 So.2d 1301, 1302 (Ala.1991). See also Denson v. Board of Trustees of the University of Alabama, 247 Ala. 257, 258, 23 So.2d 714, 715 (1945), and Ex parte Barger, 243 Ala. 627, 628, 11 So.2d 359, 360 (1942).
An additional argument that might have been, but was not, made by the respondents is that the probate court, in exercising its authority to issue marriage licenses, acts not as a “court” or a “court of inferior jurisdiction” in relation to this Court, but as an executive minister. API and ACAP themselves cite authority for the proposition that “ ‘[t]he issuance of a marriage license by a judge of probate is a ministerial and not a judicial act.’ ” (Quoting Ashley v. State, 109 Ala. 48, 49, 19 So. 917, 918 (1896).)
There are several problems with attempting to conclude that this Court lacks *513 jurisdiction on the basis of such a purported distinction in Alabama Textile. First, the respondent in Alabama Textile was not a “court” either. It was the Alabama Department of Industrial Relations, an agency of the executive branch of government. Although its internal procedures for decision-making might have been quasi-judicial in nature, its eventual action or inaction was that of an executive agency, not a court.
It would further appear that the exact nature of the party before the Court in Alabama Textile was of no moment to the Court, and would have been of no moment even if examined more closely, given the provisions of § 12-2-7(2). As noted, that section states simply that the Supreme Court “shall have authority ... [t]o exercise original jurisdiction in the issue and determination of writs of quo warranto and mandamus in relation to matters in which no other court has jurisdiction.” The text refers not to writs directed to lower “courts” but to “matters in which no ... court” (other than the Supreme Court) would have jurisdiction. In addition, of course, there is the fact that the writ of quo warranto authorized thereby is not a writ issued only to courts acting as courts, but is in the normal course a writ issued to individuals purporting to hold (or exercise the authority of) offices of all sorts in all three branches of government. In fact, this Court recently exercised its original jurisdiction under § 12-2-7(2) to issue a writ of mandamus to a probate judge in his administrative capacity where no circuit court had the ability to do so.[6]
It is clear that no other court in this State has the jurisdiction to provide the relief necessary in this most unusual of cases. There is a need for immediate, uniform relief among all the probate judges of this State, and no circuit court has jurisdiction over any probate judge outside its territorial jurisdiction. See Brogden v. Employees’ Ret. Sys., 336 So.2d 1376 (Ala.Civ.App.1976) (explaining that the Constitution authorized the Legislature to divide the state into judicial circuits with geographical or territorial boundaries, that within such boundaries each circuit court exercises the authority granted it exclusive of other circuit courts, and therefore the statutory grant to a circuit court of supervisory power over inferior jurisdictions could be applied only to such inferior judicial bodies that sat or acted within the territorial limits of the circuit), cert. denied sub nom., Ex parte State ex rel. Baxley, 336 So.2d 1381 (1976).
Alabama Textile offers a helpful framework for assessing the necessity of action by this Court under § 12-2-7(2) in this case:
“The necessity is not wholly dependent upon whether some court inferior to this has the legal power by certiorari to review the order in question. See Ex *514 parte Boynton, 44 Ala. 261 [(1870)]. But the rule observed elsewhere with a similar provision of the constitution seems to be that the higher court will not take jurisdiction where the application can be made to a lower court, unless for special reasons complete justice cannot otherwise be done, as where the case is of more than ordinary magnitude and importance to prevent a denial of justice or where no application can be made to the lower court in time to prevent the consummation of the alleged wrong. 14 Corpus Juris Secundum, Certiorari, p. 204, § 57. That authority cites Halliday v. Jacksonville [& Alligator] Plank Road Co., 6 Fla. 304 [ (1855) ]. The report of that case quotes the constitution of Florida in identical language as our section 140, supra, as here material, and observes: ‘It is not doubted, but that under the latitude given by the said proviso, a writ of certiorari will lie from this Court to any of the inferior jurisdictions, whenever an appropriate case may be presented, or it shall become necessary for the attainment of justice.’ [6 Fla. at 304.]
“We do not think that the requirement of the Constitution that we shall issue such writs only when necessary to give us a general superintendence fees an iron-clad rule that we cannot do so when another court inferior in grade to us has a like power.
“While we hold that the Circuit Court of Montgomery County may review by appropriate remedial writs the boards and commissions of the State sitting in Montgomery, we also think that this Court may do so when in our judgment it is necessary to afford full relief and do complete justice. An exercise of such discretion will receive more favorable consideration when the interested parties appear and virtually agree that there is such necessity by submitting the cause without making the objection that there is an absence of it. We have the right to determine whether a necessity exists, influenced by the magnitude and import,anee of the question involved, and the convenience of the parties in presenting it, rather than in first going to the Circuit Court of the county where the board sits.
“On account of the importance of the question here involved, its state-wide application, the need of an early decision, the territorially restricted jurisdiction of the circuit court and the consent of the parties, we have concluded in the exercise of our power and discretion to give consideration to the merits of the question and make decision of it.”
242 Ala. at 613-14, 7 So.2d at 306 (emphasis added).
The “magnitude and importance” of the issue before us is unparalleled. And the “special reasons” that compel us to act are unlike any other in the history of our jurisprudence. Given the textual grant of authority described above, the sui generis nature of this matter, the unprecedented existing and potential confusion and disarray among the probate and other judges of this State, the multiplicity and magnitude of the substantive issues presented, the resulting need for an immediate resolution of this matter, the unavailability in any other court of the immediate statewide relief that is needed, and this Court’s ultimate responsibility for the orderly administration of justice in this State, we are clear to the conclusion that this Court has the authority to act in this matter to maintain and restore order in the administration of our laws by the probate judges and the courts of this State.

B. This Proceeding Is Between Adverse Parties with Standing

The respondents argue that the relators lack “standing” to bring this action be *515 cause, they say, the relators have no private interest or private right in the performance by Alabama’s probate judges of their duty to issue marriage licenses only in accordance with Alabama law. The respondents fail to allow for the fact, however, that the present petition is filed in the name of the State for the purpose of securing performance by public officials of a duty owed to the public, not in the name of a private party to enforce a private right or duty.
The rule of public-interest standing, sometimes referred to as the public-interest exception, has been widely and long-recognized. Consistent with this principle, this Court has stated that a relator has standing to bring a petition for mandamus or comparable relief, in .the name of the State, seeking to uphold a State statute and to secure performance by respondents of a duty owed to the public,
“It is now the settled rule in Alabama that a mandamus proceeding to compel a public officer to perform a legal duty in which the public has an interest, as distinguished from an official duty affecting a private interest merely, is properly brought in the name of the State on the relation of one or more persons interested in the performance of such duty to the public.... ”
Kendrick v. State ex rel. Shoemaker, 256 Ala. 206, 213, 54 So.2d 442, 447 (1951); see also Morrison v. Morris, 273 Ala. 390, 392, 141 So.2d 169, 170 (1962) (same); Homan v. State ex rel. Smith, 265 Ala. 17, 19, 89 So.2d 184, 186 (1956) (same). Indeed, this has been well settled in Alabama for over 100 years: “There is no doubt that, where the writ is sued out to require the performance of a definite duty to the public, the proceeding must proceed in the name of the state as plaintiff.” Bryce v. Burke, 172 Ala. 219, 230, 55 So. 635, 638 (1911) (opinion on rehearing).
This Court did not fundamentally change the law of standing in Alabama in 2003 when it adopted the federal formulation of the general standing rule focusing on injury. See Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C., 890 So.2d 70, 74 (Ala.2003). Rather, the Court “effectively restated the standard ... using language adopted from the Supreme Court of the United States.” Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d 1253, 1256 (Ala.2004) (emphasis added). The Cedar Bluff Court explained the development ás follows:
“In Jones v. Black, 48 Ala. 540 (1872), this Court first articulated a test for determining whether a party has the necessary standing to challenge the constitutionality of an act of the Legislature. We stated then:
“ A party who seeks to have an act of the legislature declared unconstitutional, must not only show that he is, or will be injured by it, but he must also show how and in what respect he is or will be injured and prejudiced by it. Injury will not be presumed; it must be shown.’
“48 Ala. at 543. In Alabama Alcoholic Beverage Control Board v. Henri-Duval Winery, LLC, 890 So.2d 70, 74 (Ala.2003), a party challenged the constitutionality of Alabama’s Native Farm Winery Act, § 28-6-1 et seq., Ala.Code 1975. In that case, this Court effectively restated the standard articulated in Jones, using language adopted from the Supreme Court of the United States:
“A party establishes standing to bring a challenge [on constitutional grounds] when it demonstrates the existence of (1) an actual, concrete and particularized “injury in fact” — “an invasion of alegally protected interest”; (2) a “causal connection between the injury and the conduct complained of’; *516 and (3) a likelihood that the injury will be “redressed by a favorable decision.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).’ ”
904 So.2d at 1256-57 (emphasis omitted).[7]
By comparing this Court’s own standing formulation from Jones v. Black, 48 Ala. 540 (1872) (focusing on injury), with the adopted, three-pronged formulation from Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (focusing on injury), the Cedar Bluff Court showed that this was no seismic shift in Alabama standing law. The Court simply used the federal formulation to state its own entrenched standing law more precisely. See Ex parte King, 50 So.3d 1056, 1059 (Ala.2010) (“[I]n 2003 this Court adopted the ... more precise[ ] rule regarding standing based upon the test used by the Supreme Court of the United States.”); Muhammad v. Ford, 986 So.2d 1158, 1162 (Ala.2007) (“In [Henri-Duval], this Court adopted a more precise rule regarding standing articulated by the United States Supreme Court”).
What this Court did not do in Henri-Duval in 2003, and has not done since, is overrule those cases recognizing the equally entrenched standing rule applicable in mandamus cases seeking to compel performance of a public duty. To be sure, the rule is known in the modern law of other states under such labels as the “public-standing exception,” the “public-standing doctrine,” and “public-interest standing,” etc. For example, the Indiana Supreme Court in 2003 concluded, after surveying the laws of numerous accordant states: “The public standing doctrine, which applies in cases where public rather than private rights are at issue and in cases which involve the enforcement of a public rather than a private right, continues to be a viable exception to the general standing requirement.” State ex rel. Cittadine v. Indiana Dep’t of Transp., 790 N.E.2d 978, 983 (Ind.2003) (emphasis added). In affirming the viability of the rale, the court explained:
“Under our general rule of standing, only those persons who have a personal stake in the outcome of the litigation and who show that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing. Absent this showing, com *517 plainants may not invoke the jurisdiction of the court. It is generally insufficient that a plaintiff merely has 'a general interest common to all members of the public.
“[Relator] seeks to avoid this general rule by invoking the public standing exception. He does not contend that he has suffered a specific injury, but argues that, because the object of the mandate is to procure the enforcement of a public duty, he has standing under Indiana’s public standing doctrine. As we recently noted in Schloss [v. City of Indianapolis, 553 N.E.2d 1204 (Ind.1990) ]:
‘“Indiana cases recognize certain situations in which public rather than private rights are at issue and hold that the usual standards for establishing standing need not be met. This Court held in those cases that when a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the. matter nor be a public official.’
“Schloss, 553 N.E.2d at 1206 n. 3 (quoting Higgins [v. Hale], 476 N.E.2d [95,] at 101 [(Ind. 1985) ]). Specifically, the public standing doctrine eliminates the requirement that the relator have an interest in the outcome of the litigation different from that of the general public.
“The public standing doctrine has been recognized in Indiana case law for more than one hundred and fifty years.”
790 N.E.2d at 979-80 (emphasis added; some citations omitted).
More recently, the historical yet still vital “public-interest standing” was invoked in a 2013 New York mandamus proceeding:
“However, in matters of great public interest, a citizen may maintain a mandamus proceeding to compel a public officer to do his or her duty. The office which the citizen performs is merely one of instituting a proceeding for the general benefit, the only interest necessary is that of the people at large. One who is a citizen, resident and taxpayer has standing to bring an Article 78 proceeding for the performance by officials of their mandatory duties, even without a personal grievance or a personal interest in the outcome. The public interest standing of a citizen has been extended to corporations as well as other organizations.
“In fact, as far back as the Nineteenth Century, the Court of Appeals held, the writ of mandamus may, in a proper case, and in the absence of an adequate remedy by action, issue ... on the relation of one, who, in common with all other citizens, is interested in having some act done, of a general public nature, devolving as a duty upon a public officer or body, who refuse to perform it.”
Marone v. Nassau Cnty., 967 N.Y.S.2d 583, 589, 39 Misc.3d 1034, 1040-41 (Sup.Ct.2013) (expressing a limitation of the doctrine to “matters of great public interest ”) (internal quotation marks and citations omitted; emphasis added).
Still more recently, the California Court of Appeal affirmed the vitality of the “public-interest exception”:
“It is true that ordinarily the writ of mandate will be issued only to persons who are beneficially interested. Yet, in [1945, the- California Supreme Court] recognized an exception to the general rule where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced. The exception promotes the pol *518 icy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right. It has often been invoked by California courts.”
Hector F. v. El Centro Elementary Sch. Dist., 173 Cal.Rptr.3d 413, 418, 227 Cal.App.4th 331, 338 (2014) (emphasis added; internal quotation marks and citations omitted).
The same rule is found in states throughout the nation. See, e.g., Southern LNG, Inc. v. MacGinnitie, 294 Ga. 657, 660, 755 S.E.2d 683, 687 (2014) (“ “Where the question is one of [a] public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown [to petition for mandamus], but it shall be sufficient that a plaintiff is interested in having the laws executed and the duty in question enforced.’ ” (quoting Ga.Code Ann. § 9-6-24 (West 2014) (emphasis added))); Protect MI Constitution v. Secretary of State, 297 Mich.App. 553, 566-67, 824 N.W.2d 299, 306 (2012), rev’d on other grounds, 492 Mich. 860, 819 N.W.2d 428 (2012); ProgressOhio.org, Inc. v. JobsOhio, 973 N.E.2d 307, 313 (Ohio Ct.App.2012); State ex rel. Kansas City Power & Light Co. v. McBeth, 322 S.W.3d 525, 531 (Mo.2010) (“[Wjhere the duty sought to be enforced is a simple, definite ministerial- duty imposed by law, the threshold for-standing is extremely low.”); Anzalone v. Administrative Office of Trial Court, 457 Mass. 647, 653-54, 932 N.E.2d 774, 781 (2010); Stumes v. Bloomberg, 551 N.W.2d 590, 592 (S.D.1996); State ex rel. Clark v. Johnson, 120 N.M. 562, 568-69, 904 P.2d 11, 17-18 (1995); Rogers v. Hechler, 176 W.Va. 713, 348 S.E.2d 299 (1986); Wells v. Purcell, 267 Ark. 456, 461, 592 S.W.2d 100, 103 (1979) (“The rule is well settled, that when ... the proceedings are for the enforcement of a dfuty affecting not a private right, but a public one, common to the whole community, it is not necessary that the relator should have a special interest in the matter.” (emphasis added)); and Florida Indus. Comm’n v. State ex rel. Orange State Oil Co., 155 Fla. 772, 775, 21 So.2d 599, 600-01 (1945) (“We also said in that case that where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, it being sufficient that he is-interested as a citizen in having the law executed and the duty in question err forced.” (emphasis added)).[8]
Alabama’s public-standing rule, as articulated in Kendrick, contemplates an action in the name of the State, which obviously has standing in its own right. Like the authorities from other states cited above, it *519 respects the injury-in-fact requirement for general standing when a plaintiff seeks in his own name to vindicate his or her private right, while equally respecting the alternative rule (or exception) for cases brought in the name of the State to vindicate the public interest in the enforcement of duties owed to the public rather than to an individual. Several Alabama cases illustrate this fidelity.
First, in Rodgers v. Meredith, 274 Ala. 179, 146 So.2d 308 (1962), a clerk of the circuit court petitioned, in his own name, for a writ of mandamus to compel the county sheriff to perform his statutory duty to file written reports with the clcerk regarding the prisoners entering and leaving the county jail. The Court held that compliance with the statute was mandatory for the sheriff. 274 Ala. at 185-86, 146 So.2d at 314. But the Court also held that the circuit clerk did not have standing to seek mandamus to compel the sheriffs performance because the statute conferred no private right on the clerk. 274 Ala. at 186, 146 So.2d at 314. In so holding,'the Court distinguished the private standing on which the clerk relied in error from the public standing on which the clerk could have relied:
iCWe hold that the duty here placed on the sheriff by [the reporting statute] is a legal duty in which the public has an interest, as distinguished from an official duty affecting a private interest merely. Under the settled rule, petition for mandamus to compel a public officer to perform such duty is properly brought in the name of the state on the relation of one or more persons interested in the performance of that duty. The instant petition was not so brought.”
274 Ala. at 186, 146 So.2d at 314-15 (emphasis added). In other words, because the duty involved was owed to the public,[9] the clerk did not.have a private interest in the matter, and so the action could be brought only as an on-relation action in the name of the State. 274 Ala. at 186, 146 So.2d at 315.
Second, in Kendrick, a citizen relator, in the name of the State, sued his county commission to force it to provide voting machines for elections in compliance with a State statute. The statute required the county'to provide voting machines for all elections in the county, but gave the commission discretion not to provide machines in any precinct having less than 100 registered voters. 256 Ala. at 213, 54 So.2d at 447. The respondents challenged the relator’s petition on the basis that he failed to show the requested relief would redress any injury particular to him, because he failed to show he voted in a precinct entitled to be provided voting machines. Id.
In rejecting the respondents’ challenge to the relator’s standing, the Court cited the public-standing rule:
“It is now the settled rule in Alabama that a mandamus proceeding to compel a public officer to perform a legal duty in which the public-has an interest, as distinguished from an official duty affecting a private interest merely, is properly brought' in the name of the State on the relation of one or more persons interested in the performance of ■such duty to the public.”
256 Ala. at 213, 54 So.2d at 447 (emphasis added). Applying the public-standing rule, the Court concluded:
*520 “It is clear that the act which petitioner seeks to have performed does not concern the sovereign rights of the' State and is one in which the public, all the people of Jefferson County, have an interest. Petitioner’s right to have the act performed is not dependent upon the fact that he may or may not vote in a voting place where the governing body is required to install a voting machine.”
Id. (emphasis added).
Similarly, in Homan v. State ex rel. Smith, 265 Ala. 17, 18, 89 So.2d 184, 186 (1956), a relator filed an action seeking to force the respondents, all the members of the Board of Commissioners of the Town of Muscle Shoals,
“ ‘to forthwith call an election for and in the Town of Muscle Shoals, a municipal corporation in Alabama, to decide the question whether said town shall be annexed to the City of Sheffield, a municipal corporation in Alabama, and to pass the necessary Ordinance providing for such an election to be held not less than thirty days after the passage of the Ordinance, in accordance with the provisions of Title 37, § 188.’ ”
265 Ala. at 18, 89 So.2d at 185. The circuit court granted the petition, and, on appeal, the respondents contended that the relator did not have a sufficient interest in the action. The Homan Court rejected the argument:
“The act sought to be performed does not concern the sovereign rights of the State and is one in which the public, all of the people of the municipalities involved, have an interest. We hold that this mandamus proceeding was properly brought in the name of the State on the relation of J.E. Smith, and that the trial court did not err in overruling motion of appellants to require Smith to show by what authority the suit was filed in the name of the State of Alabama.”
265 Ala. at 19, 89 So.2d at 186 (emphasis added).
In Gray v. State ex rel. Garrison, 231 Ala. 229, 231, 164 So. 293, 295 (1935), the Court held that a county commissioner’s statutory duty to sign a warrant on appropriation for a public library was “a legal duty in which there was such public interest as warranted a proceeding by mandamus in the name of the state.” And in Marshall County Board of Education v. State ex rel. Williams, 252 Ala. 547, 551, 42 So.2d 24, 27 (1949), the Court held that a petition for mandamus to a county board of education to compel its performance of a statutory duty to allow school enrollment only to students of a certain age “was for the enforcement of a public duty by respondents and, therefore ... was properly brought in the name of the State on the relation of the petitioners.”
Whereas in Rodgers the petitioner lacked standing to bring the action in his own name because he had no particularized injury (and he failed to invoke public standing through an on-relation action in the name of the State), in each of the other cases discussed above the relator properly invoked public standing. In each, the official duty was imposed by applicable law, and the duty owed was to the public. In particular, the right at issue was not the relator’s private right.
In Henri-Duval Winery, L.L.C., 890 So.2d at 74, the plaintiff, a winery, brought an action for its own benefit, not that of the public, to invalidate, not enforce, a statute providing for the taxation of wine sales. A careful reading of the plurality opinion in Ex parte Alabama Educational Television Commission, 151 So.3d 283 (Ala.2013), reveals a similar circumstance. The plaintiffs there sought not to procure an injunction requiring the commission to hold open meetings in the future pursuant *521 to applicable law, something that could benefit the public, but to vindicate a violation of their private rights allegedly stemming from a meeting that had already occurred:
“Applying the Lujan[ v. Defenders of Wildlife, 504 U.S. 555 (1992),] test here, we conclude that Pizzato and Howland do not have standing to bring this action because they have failed to demonstrate ‘a likelihood that [their alleged] injury will be “redressed by a favorable decision.” ’ Henri-Duval, supra. Pizzato and Howland argue that they were injured by the Commission’s termination of their employment and that that ‘termination was the direct result and consequence of the Commissioners’ violation of the Open Meetings Act.’
[[Image here]]
“... [T]he only specific relief Pizzato and Howland requested was the civil fines provided for in § 36-25A-9(g)[, Ala.Code 1975]. Like the injury in Steel Co. [v. Citizens for a Better Environment, 523 U.S. 83 (1998) ], however, the alleged injury here was caused by an alleged one-time violation of the Open Meetings Act that was wholly past when Pizzato and Howland’s action was filed. Pizzato and Howland have not alleged any ‘continuing or imminent violation,’ nor does any ‘basis for such an allegation appear to exist.’ ”
Alabama Educ. Television Comm’n, 151 So.3d at 288 (footnote omitted); see also id. at 291 (Murdock, J., concurring specially) (“[W]e do not have before us a claim by which a media organization or a citizen seeks to enjoin an anticipated future violation of the statute.”).
In sum, injury in fact has always been the primary focus of Alabama’s general standing rule (as it has been for the other states discussed above). See King, 50 So.3d at 1059 (“Traditionally, Alabama courts have focused primarily on the injury claimed by the aggrieved party to determine whether that party.has standing.”). For over a century, however, Alabama has recognized that actions may be brought in the name of the State in circumstances comparable to those in which other states refer to public-interest standing. See, e.g., Bryce, 172 Ala. at 229, 55 So. at 638. As in other states, as Alabama adopted the formulaic restatement of the general standing rule (adopted by- this Court in Henri-Du-val ), we did not overrule our cases providing for such proceedings by persons interested in the enforcement of a public duty.[10]
As indicated, relators must show that they are seeking to require a “public offi *522 cer to perform a legal duty in which the public has an interest.” Kendrick, 256 Ala. at 213, 54 So.2d at 447. It could not be clearer that the public — the people of Alabama — 'have an interest in the respondents’ faithful compliance with Alabama’s marriage laws. The duty owed by the probate judges to follow state law in the issuance of marriage licenses is a duty owed to the public. We refer the reader in this regard to our discussion of the fundamental nature of this law and the critical interest of the public in it for the reasons discussed in Part I above.[11]
That the duty and corresponding right at issue are owed to and held by the public is made even clearer when one considers the exact nature of the duty in question as one that is not even susceptible of vindication as a private right. The duty is not of some affirmative action on the part of the respondents, because the statute in question merely authorizes, without requiring, the issuance of licenses by a probate judge. See § 30-1-9 (a probate judge “may” issue marriage licenses). Rather, the duty sought to be enforced is in the negative, i.e., to not take certain action. It is a duty not to issue marriage licenses to same-sex couples. It is hard to conceive of a private right- in any person to prevent the issuance of a marriage license, .to another person. The duty and the corresponding right are intrinsically public in their nature, not even susceptible to an action by an individual asserting a private right as to their enforcement.
Notwithstanding the foregoing, the respondents contend that the present case falls within a subcategory of on-relation cases that can only be brought in the name of the State by the Attorney General. They point to the below emphasized portion of the larger passage from Williams with which we began our discussion of standing:
“It is now the settled rule in Alabama that a mandamus proceeding to compel a public officer to perform a legal duty in which the public has an interest, as distinguished from an official duty affecting a private interest merely, is properly brought in the name of the State on the relation of one or more persons interested in the performance of such duty to the public; but if the matter concerns the sovereign rights of the State, it must be instituted on the relation of the Attorney General, the law officer of the State”
Marshall Cnty. Bd. of Educ. v. State ex rel. Williams, 252 Ala. 547, 551, 42 So.2d 24, 27 (1949).
In Morrison v. Morris, 273 Ala. 390, 391-92, 141 So.2d 169, 169-70 (1962), the relator, a member of the Jefferson County Board of Equalization, sought a writ of mandamus against the chairman of the board to void a notification sent by the board to certain taxpayers that changes had; been made in assessment of their property,
“Identical motions to dismiss were filed' by the appellee, by the State of Alabama, and by the Attorney General individually, grounded upon the position that the appellant was not a proper party to the petition since the functioning of *523 the Board was an activity affecting the sovereign rights of the State, necessitating the filing of such petition by the law officer of the State, the Attorney General.”
273 Ala. at 391, 141 So.2d at 169. The Morrison Court agreed that the action fell within the sovereign rights of the' State and as such could not be brought as an on-relation action by a private party in the name of the State. Its explanation of the applicable rule begins to shed light on its inapplicability to the present case, however: '
“The conduct of County Boards of Equalization is governed by legislative act. Title 51, §§ 81-113, Code, and amendments. The authority of these Boards, having emanated from the State, it necessarily follows that the functioning of the Boards is a matter affecting the State, which has a peculiar interest in the uniformity of their activities. ‘The right of a private individual to enforce by mandamus duties owing to the public is necessarily confined to duties which are not owing to the state in its sovereign capacity. Where the duty is owing to the government as such, private individuals, even though taxpayers, cannot resort to mandamus to enforce it; —’ 35 Am.Jur., Mandamus, § 321, citing State ex rel. Foshee v. Butler, 225 Ala. 194, 142 So. 533 [ (1932) ]. See also State ex rel. Chilton County v. Butler, 225 Ala. 191, 142 So. 531 [ (1932) ]. Where a right pertains to the sovereignty of the State, proceedings for the enforcement of such right are to be instituted by the Attorney General.”
273 Ala. at 391-92, 141 So.2d at 169-70 (emphasis added).
The rule as stated in Marshall County and Morrison is that only the Attorney General may bring an action in the name of the State if its purpose is to enforce a “duty owing to the government as such.” The duty in those cases concerned the payment of taxes. Lewright v. Love, 95 Tex. 157, 159, 65 S.W. 1089, 1089-90 (1902), is an early example of an action involving the sovereign rights of the state in which the court well explains the significance of this fact. In Lewright, the private relator
“file[d] a petition for a writ of mandamus against the comptroller of the state to compel him to institute a suit against the International .& Great Northern Railroad Company to recover taxes alleged to be due the state upon the gross passenger earnings of a certain line of its road for the series of years extending from 1879 to 1900.”
95 Tex. at 159, 65 S.W. at 1089. The Texas Supreme Court concluded that the relator could not bring the action, explaining:
“Suits to collect debts due the state must, as a rule, be brought in the name of the state, and by its principal law officer, the attorney general, or by some other law officer whose <iuty it is to represent the state in legal proceedings, and who may be authorized by statute to sue for it in the particular class of cases.

<(

“In the case of Kimberl[]y v. Morris, 87 Tex. 637, 31 S.W. 808 [(1895)], the rule announced in [Union Pacific] Railroad Co. v. Hall, 91 U.S. 343, 23 L.Ed. 428 [ (1875) ], ‘that private persons may move for a mandamus to enforce a public duty not due to the government as such, without the intervention of the government law officer,’ was quoted with approval.... [I]t should be held, as it seems to us, that a citizen of the state, though a taxpayer, cannot maintain a suit to compel an officer to perform a junction due merely to the government as such, and in which he can *524 have no private interest whatever. There are some decisions which probably hold to the contrary, but we think the great weight of authority and the better reason support the rule announced by us. We therefore conclude that, if a suit of this character were maintainable against the comptroller, the relator in the petition before us is not the proper party to bring it.”
95 Tex. at 159-60, 65 S.W. at 1089-90 (emphasis added). The duty in Le-wright — the collection of taxes owed to the government — was one owed to the government as such, and as such could only be brought by the state’s attorney general.
The Lewright court’s conclusion followed from the fact that taxation is a sovereign right of the state, a proposition that has been repeated by courts throughout the country, including our own. See, e.g., Doremus v. Business Council of Alabama Workers’ Comp. Self-Insurers Fund, 686 So.2d 252, 253 (Ala.1996) (“The exclusive power and authority to sue for collection of State taxes lies with the State.”); State ex rel. St. Louis Young Men’s Christian Ass’n v. Gehner, 320 Mo. 1172, 1182, 11 S.W.2d 30, 34 (1928) (“Taxation is a sovereign right of the state.... ”); and Aldridge v. Federal Land Bank of Columbia, 203 Ga. 285, 290, 46 S.E.2d 578, 581 (1948) (noting “the sovereign right of the State to tax as declared by the constitution”).[12]
Alabama on-relation cases bear out this distinction between duties owed to the government and duties owed to the public. This Court has addressed cases concerning the sovereign rights of the State in which the Court concluded that a private party could not bring the on-relation action. In Morrism, as already noted, the Court concluded that the duty of the Board of Equalization was owed to the government as such, not to the public at large, because it implicated the power of taxation.
Another such case, heavily relied upon by the respondents, is State ex rel. Foshee v. Butler, State Tax Commissioner, 225 Ala. 194, 142 So. 533 (1932), a case in which the relator, a resident citizen and taxpayer of Chilton County, sought a writ of mandamus to compel the State tax commissioner to assess the property of the Alabama Power Company in that county at 60 percent instead of 45 percent. The Court concluded that the
“Relator shows no official duty to the public at large, but only to the state in its sovereign capacity. The general rule is that an individual cannot enforce a right omng to the government; certainly not in any case, unless he sustains an injury peculiar to himself....
“He is, as is Chilton [C]ounty in its case, merely seeking to force the state, by the unauthorized use of its name, to control an administrative function of one of its officers, in respect to a matter which is the prerogative of the state.”
225 Ala. at 195, 142 So. at 534.
The Foshee Court’s mention of the case of “Chilton County” is a reference to State *525 ex rel. Chilton County v. Butler, State Tax Commissioner, 225 Ala. 191, 142 So. 531 (1932), what Foshee describes as the “companion case” to Foshee, 225 Ala. at 194, 142 So. at 533. In Chilton County, the county likewise brought an on-relation action to force the tax commissioner .to assess the property of Alabama Power Company in that county at 60 percent instead of 45 percent. In a passage that explains the outcome in both cases, the Court stated:
“In respect to petitions for mandamus and other remedial writs when they seek to enforce private rights, petitioner may pursue such remedy without the use of the name of the state.... But when relief is sought against a public officer to require the performance of a public duty to the general public as distinguished from the state in its sovereign capacity, the petition is properly brought in the name of the state on the relation of petitioner, a member of the general public who may have such right.”
Chilton County, 225 Ala. at 192-93, 142 So. at 532. Both Chilton County and Foshee, however, involved the tax commissioner. The duty involved was one owed to the government as such, not to the public at large:
“So that when a county undertakes to use the name of the state to require state officers to fix a certain value upon property for taxation generally, it is seehing to enforce a ’claim which involves sovereign capacity, rather than one which relates to a function delegated to the county, and does not show a 'private right with the privilege of using the name of the state as a mere formal party. 38 Corpus Juris, 838.
“Relator here is seeking to use the name of the state to enforce a public duty to it in its sovereign right which belongs exclusively to [the state], and it has not delegated to the county nor to any one the right to enforce the duties to it of its own administrative officer. The Attorney General and perhaps the Governor are vested with the ultimate power, conferred by the sovereignty, to .control this sort of litigation.”
Chilton County, 225 Ala. at 193-94, 142 So. at 533.[13]
*526 In a separate argument, the respondents contend that the above-emphasized language states that the petitioner must have some “injury peculiar to himself’ in order to qualify.as a relator who can invoke the standing of the State in an on-relation action. Respondents misread Foshee and Chilton County and ignore other Alabama authorities in reaching this conclusion. Again, in Foshee, the Court noted that the “[r]elator shows no official duty [by the defendant] to the public at large, but only to the state in its sovereign capacity. The general rule is [indeed] that an individual cannot enforce a right owing to the government; ■ certainly not in any case, unless he sustains an injury peculiar to himself.” 225 Ala. at 195, 142 So. at 534 (emphasis added). In other words, a private party cannot bring an action that concerns a duty owed to the government as such, unless the private party also seeks to vindicate or obtain redress for his or her own private rights or injury relating thereto.[14]
*527 Granted, Kendrick and similar cases do refer to on-relation actions brought in the name of the State “on the relation of one or more persons interested in the performance of [a] duty” to the public. E.g., Kendrick, 256 Ala. at 213, 54 So.2d at 447. Even if we were to now consider this language as a basis for qualifying prospective on-relation plaintiffs beyond the holding of mere citizenship, the nature of the “interest” wé would impose in order to qualify a relator on behalf of the State, at least in the unique situation where, as here, the Attorney General is unavailable to fulfill his normal role of representing the public interest, certainly would not be an interest that rises to the same level required of plaintiffs under Lu-jan. The State itself supplies that standing. The only question would be whether the relator has a sufficient “peculiar interest” in the matter or a sufficient relationship to the State, coupled with the ability to do so, that he or she can be expected to prosecute the matter vigorously to the end of assuring a proper adversarial proceeding for its just resolution. Ultimately! wé need not resolve the question whether there is a need for such an interest that would bear on API’s and ACAP’s status as relators in this proceeding. We are clear to the conclusion that Judge Enslen more than satisfies such criteria. ‘ As an individual, he would have the same interest held by other members of the public, yet, in his official capacity, he obviously has a relationship with the State and an interest in discharging his ministerial duty in a manner that is consistent with both Alabama law and the United States Constitution. Moreover, in his judicial capacity, his jurisdiction includes cases involving adoptions, administration of estates, guardianships, and conservatorship in which he must assess whether a marriage exists. In other words, Judge Enslen’s position will require him to confront the question of the validity of purported “marriages” licensed by other probate judges and to address unavoidable derivative questions. Indeed, even if we were to consider the issue before us as a matter concerning the “sovereign right” of the State as urged by the respondents, Judge Enslen would well qualify to prosecute it in the name of the State under the circumstances presented.[15]
Judge Reed also argues that there must be a limitation on public standing because “[a]ll laws and executive actions affect the public in some sense, directly or indirectly.” But he cannot point to any authority or to the articulation of some sort of rule that would explain where we are to draw the line between those “public-duty” cases *528 that members of the public can bring and those that only the Attorney General can bring. The only line articulated in precedents here or elsewhere is between those cases that involve a duty owed to the public and those that involve a duty owed to the government as such. We can find no line of the nature he suggests differentiating between public-duty cases that can be brought by a citizen and those that can be brought only by the Attorney General, with one exception: Many states have limited the availability of on-rélation or comparable actions on behalf of the state to “matters of great public interest” or “matters of great importance.” We have no problem applying such a limitation 'in the present case, for we can think of no matter of greater public interest or importance than the one before us.
It is beyond question that the duty to issue marriage licenses only in accordance with Alabama law is a duty owed to the public for its benefit. The failure to perform that duty damages the framework of law and institutions the people have chosen for themselves. The proceeding before us is properly before us as an on-relation action to enforce a duty to the public — the people who must live their lives and raise their families within that framework and within the society made possible thereby.

C. The Federal Court Order Does Not Prevent this Court from Acting

The final procedural issue we consider is whether the federal court’s order prevents this Court from acting with respect to probate judges of this State who, unlike Judge Davis in his ministerial capacity, are not bound by the order of the federal district court in Strawser. The answer is no. ,
Although decisions of state courts on federal questions are ultimately subject to review by the United States Supreme Court, 28 U.S.C. § 1257(a), as are decisions of federal courts, neither “coordinate” system reviews the decisions of the other. As a result, state courts may interpret the United States Constitution independently from, and even contrary to, federal courts.[16] For that matter, it is even true that “ ‘[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.’ ” Camreta v. Greene, 563 U.S. 692, 709, 131 S.Ct. 2020, 2033 n. 7, 179 L.Ed.2d 1118 (2011) (quoting 18 J. Moore et al., Moore’s Federal Practice § 134.02[l][d], p. 134-26 (3d ed. 2011)). As the Seventh Circuit Court of Appeals noted in Anderson v. Romero, 72 F.3d 518, 525 (7th Cir.1995), “[federal district court decisions] cannot clearly es *529 tablish the law because, while they bind the parties by virtue of the doctrine of res judicata, they are not authoritative as precedent and therefore do not establish the duties of nonparties.”
Numerous Alabama cases confirm this reasoning. “[I]n determining federal common law, we defer only to the holdings of the United States Supreme Court and our own interpretations of federal law. Legal principles and holdings from inferior federal courts have no controlling effect here, although they can serve as persuasive authority.” Glass v. Birmingham So. R.R., 905 So.2d 789, 794 (Ala.2004). See also Dolgencorp, Inc. v. Taylor, 28 So.3d 737, 744 n. 5 (Ala.2009) (noting that “United States district court decisions are not controlling, authority in this Court”); Ex parte Hale, 6 So.3d 452, 458 n. 5 (Ala.2008), as modified on denial of reh’g (“[W]e are not bound by the decisions of the Eleventh Circuit.”); Ex parte Johnson, 993 So.2d 875, 886 (Ala.2008) (“This Court is not bound by decisions of the United States Courts of Appeals or the United States'District Courts....”); Buist v. Time Domain Corp., 926 So.2d 290, 297 (Ala.2005) (“United States district court cases ... can serve only as persuasive authority.”); Amerada Hess Corp. v. Owens-Corning Fiberglass Corp., 627 So.2d 367, 373 n. 1 (Ala.1993) (“This Court is not bound by decisions of lower federal courts.”); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 n. 2 (Ala.1991) (“Decisions of federal courts other than the United States Supreme Court, though persuasive, are not binding authority on this Court.”).
Federal courts have recognized that state-court review of constitutional questions is independent of the same authority lodged in the lower federal courts. “ ‘In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is a parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court.’ ” United States ex rel. Lawrence v. Woods, 432 F.2d 1072, 1075 (7th Cir.1970) (quoting State v. Coleman, 46 N.J. 16, 36, 214 A.2d 393, 403 (1965)).
“Although consistency between state and federal courts is desirable in that it promotes respect for the law and prevents litigants from forum-shopping, there is nothing inherently offensive about two sovereigns reaching different legal conclusions. Indeed, such results were contemplated by our federal system, and neither sovereign is required to, nor expected to, yield to the other.”
Surrick v. Killion, 449 F.3d 520, 535 (3d Cir.2006).
The United States Supreme Court has acknowledged that state courts “possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law.” ASARCO Inc. v. Kadish, 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Two Justices of the United States Supreme Court in special writings have elaborated on this principle.
“The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court’s interpretation of federal law give way to a (lower) federal court’s interpretation. In our federal system, a state trial court’s interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located.”
Lockhart v. Fretwell, 506 U.S. 364, 375-76, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) *530 (Thomas, J., concurring). See also Steffel v. Thompson, 415 U.S. 452, 482 n. 3, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (Relinquish J., concurring) (noting that a state court “would not be compelled to follow” a lower federal court decision).
III. Respondents’ Ministerial Duty is Not Altered by the United States Constitution
The United States District Court for the Southern District of Alabama has declared that Alabama’s laws that define marriage as being only between two members of the opposite sex — what has been denominated traditional marriage — violate the United States Constitution. After careful consideration of the reasoning employed by the federal district court in Searcy I, we find that the provisions of Alabama law contemplating the issuance of marriage licenses only to opposite-sex couples do not violate the United States Constitution and that the Constitution does not alter or override the ministerial duties of the respondents under Alabama law.
It is important to observe at the outset that some of the federal courts that have declared traditional marriage laws unconstitutional have insinuated that these marriage laws are something new by pointing to the marriage laws and amendments that states began enacting in the early 1990s. By focusing on this spate of laws, the federal courts have asserted that marriage laws were enacted to target homosexuals. This line of argument was born in United States v. Windsor, — U.S. —, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), when the United States Supreme Court concluded that Congress’s passage of the Defense of Marriage Act (“DOMA”) in 1996 demonstrated a clear animus toward homosexuals because Congress rarely chose to enter the realm of domestic-relations law. But as Windsor itself observed, domestic law historically is controlled by the states.[17]
For example, in Alabama it is true that the Act was enacted in 1998 and that the Amendment was ratified in 2006. Laws that include the concept of marriage as between a husband and wife have existed, however, since the inception of Alabama as a state in 1819.[18] Such laws include the *531 full statutory scheme set out in the provisions -of Chapter 1 of Title 30 (and their predecessors dating back 200 years) by which the legislature has provided for the affirmative licensing and recognition of “marriage,” including the provision in § 30-1-9 (and its predecessors) for the licensing of “marriages” and the provisions in § 30-1-7 (and its predecessors) for the solemnization of “marriages.” And it is clear that the term “marriage” as used in all those laws always has been, and still is (unless the courts can conjure the ability to retroactively change the meaning of a word after it has been used by the legislature), a union between .one man and one woman.
Further, the contemplated change in the definition (or “application” if one insists, although this clearly misapprehends the true nature of what is occurring) of the term “marriage” so as- to make it mean (or apply to) something antithetical to - that which was intended by the legislature and to the organic purpose of Title 30, Chapter 1, would appear to require nothing short of striking down that entire statutory scheme.[19] And beyond even that statutory *532 scheme, what ultimately is at issue is the entire edifice of family law discussed previously, an edifice that has existed in some form since before the United States was even a country.[20] See 1 Judith S. Critten-den and Charles P. Kindregan, Jr., Alabama Family Law § 1:1 (2008) (observing that “a whole range of state and federal legal rights and obligations depend on the existence of a valid marriage. If there is no legal marriage, then those rights and obligations do not apply. These legal rights and obligations are basic to the well-being of society, as the United States Supreme Court has noted in describing the importance of marriage as having a ‘basic position’ in ‘society’s hierarchy of values.’ ” (quoting Boddie v. Connecticut, 401 U.S. 371, 374, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971))). It is no small thing to wipe away this edifice with a wave of the judicial wand.
It is in this context that we turn then to the specific' reasoning employed by the federal district court, reasoning that can be boiled down to the following train of thought. (1) Marriage is a fundamental right. (2) Under the Due Process and Equal Protection Clauses of the United States Constitution, laws that impinge upon fundamental rights are subject to “strict scrutiny” and are sustained only if supported by a “compelling state interest” and if they are “narrowly tailored” to fulfill that interest. (3) The interests cited by the State of Alabama in support of its laws limiting marriage to opposite-sex couples are either not compelling state interests or the limitation is not so narrowly tailored as to meet the stated interest. (4) Therefore, Alabama’s marriage laws impermissibly violate the right to marry and consequently “violate the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.”
The Searcy I plaintiffs’ first constitutional claim that led to the federal court’s decision and the reasoning it adopted is one that is often repeated in the marriage debate. The Searcy I plaintiffs contended that Alabama’s marriage laws violate the Equal Protection Clause because those laws unconstitutionally discriminate against same-sex couples in favor of opposite-sex couples by conferring benefits on the latter under the law not accorded to the former.
“The Equal Protection Clause of the Fourteenth Amendment commands that no State shall ‘deny to any person within its jurisdiction the equal protection of the laws,’ which is essentially a direction that all persons similarly situated should be treated alike_ The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.
*533 “The general rule gives way, however, when a statute classifies by race, alien-age, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy — a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.”
City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (emphasis added and citations omitted).
The difficulty with the Searcy I plaintiffs’ equal-protection claim is that, in order to trigger a “strict-scrutiny” analysis, the offending law must discriminate against a suspect class, e.g., a class determined by race, alienage, or national origin. It- is .often contended that although, laws upholding traditional marriage do not implicate any of. these suspect classes, they do discriminate based on gender, a category the United States Supreme Court has stated is sometimes entitled to heightened scrutiny. See, e.g., United States v. Virginia, 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (observing that “[w]ith-out equating gender classifications, for all purposes, to classifications based on race or national origin, the Court, in post Reed[ v. Reed, 404 U.S. 71 (1971),] decisions, has carefully inspected official action that closes a door or denies opportunity to women (or to men)” (footnote omitted)).
The fact is, however, that traditional-marriage laws do not discriminate based on gender: All men and all women are equally entitled to enter the institution of marriage. Only by redefining the term “marriage” to mean something it is not (and in the process assuming an answer as part of the question), can this statement be challenged. Put in the negative, traditional-marriage laws do not discriminate on the basis of gender because all men and all women are equally restricted to marriage between the opposite sexes. See, e.g., Bishop v. United States ex rel. Holder, 962 F.Supp.2d 1252, 1286 (N.D.Okla.2014) (“Common sense dictates that the intentional discrimination occurring in this case has nothing to do with gender-based prejudice or stereotypes, and the law cannot be subject to heightened scrutiny on that basis.”); Geiger v. Kitzhaber, 994 F.Supp.2d 1128, 1139-40 (D.Or.2014) (“The state’s marriage laws discriminate based on sexual orientation, not gender. In fact, the ban does not treat genders differently at all. Men and women are prohibited from doing the exact same thing: marrying an individual of the same gender.”). Thus, if such laws discriminate against a classification, it is one based on sexual orientation, not gender. As the federal district court itself observed in its memorandum opinion in Searcy I: “Eleventh Circuit precedent] holds that such classification is not suspect. Lofton v. Secretary of Dep’t of Children and Family Services, 358 F.3d 804, 818 (11th Cir.2004).”[21] See also DeBoer v. *534 Snyder, 772 F.3d 388, 413 (6th Cir.2014) (noting that “[tjhe Supreme Court has never held that legislative classifications based on sexual orientation receive heightened review and indeed has not recognized a new suspect class in more than four decades”). - ■
Because Alabama’s marriage laws are not subject to strict scrutiny under the Equal Protection Clause, they need only survive a rational-basis analysis to pass constitutional muster. We have reviewed at length the more than rational bases for Alabama’s understanding of marriage in Part I, above. As discussed, one legitimate interest behind the laws (among others) is recognizing and encouraging the ties between children and their biological parents. Alabama’s marriage laws clearly survive rational-basis review.
The Searcy I plaintiffs’ second contention was that Alabama’s marriage laws violate the Due Process Clause of the Fourteenth Amendment because, according to their complaint, “[t]he Constitution protects the rights and liberties of married, homosexual couples just as it does heterosexual, married couples.” As we previously noted, the federal district court latched onto this argument, stating that “[n]umerous cases have recognized marriage as a fundamental right.” ' In this way, the federal district court subjected Alabama’s marriage laws to stricb-scrutiny analysis.
To support its assertion that “marriage” is a fundamental right, the federal district court cited such cases as Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The federal district court is, of course, correct that there are several United States Supreme Court cases stating such a principle. In Zablocki v. Redhail, 434 U.S. 374, 383-84, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), for example, the Court stated: “‘Marriage is one of the “basic civil rights of man,” fundamental to our very existence and survival.’ [Loving, 388 U.S.] at 12, quoting Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942).” In Griswold, the Court stated that marriage is “a right of privacy older than the Bill of Rights— older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to.the degree of being sacred.” 381 U.S. at 486. In Meyer, the Court recognized that “the right of an individual ... to marry, establish a home and bring up children” is protected by the Due Process Clause. 262 U.S. at 399.
' What the federal district court ignored in these cases, however, is that the Supreme Court plainly was referring to traditional marriage when it proclaimed that marriage is a fundamental right. See, e.g., DeBoer, 772 F.3d at 412 (observing that “[w]hen Loving and its progeny used the word marriage, they did not redefine the term but accepted its traditional meaning”). This is evident from the fact that in each of those cases the discussion of the right involved children. It is also apparent from the fact that, as the federal district court discussed, in Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972), the Supreme Court summarily dismissed “for want of a substantial federal question” an appeal from the Minnesota Supreme Court in which that court concluded that a state statute *535 defining marriage in the traditional manner did not violate the First, Eighth, Ninth, or Fourteenth Amendments to the United States Constitution. Despite disagreement among the federal circuit courts of appeal regarding Bakers strength as precedent in the wake of Windsor,[22] Baker indisputably demonstrates that, in the plethora of cases in which the Supreme Court has discussed a “right to marriage,” it was not referring to an institution that formally recognized homosexual relationships.
Thus, what the federal district court has done is to declare an entirely new concept of “marriage” a fundamental right under the guise of the previously understood meaning of that institution. It is, plainly and'simply, circular reasoning — it assumes the conclusion of the matter, i.e., that marriage as newly defined is a fundamental right, in the premise of the question -without acknowledging that a change of terms has occurred.[23] As one federal appeals court judge has noted: “To now define the previously recognized fundamental right to ‘marriage’ as a concept that includes the new notion of ‘same-sex marriage’ amounts to a dictionary jurisprudence, which defines terms as convenient to attain an end.”[24] Bostic v. Schaefer, 760 F.3d 352, *536 391 (4th Cir.2014) (Niemeyer, J., dissenting).[25]
■ The ostensible reason for the federal district court’s judicial sleight of hand is apparent enough: conferring fundamental-right status upon a concept of marriage divorced from its traditional understanding is, to say the least, curious.
“[W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition,’ [Moore v. City of East Cleveland, Ohio, 431 U.S. 494 (1977) ] (plurality opinion); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) (‘so rooted in the traditions and conscience of our people as to be ranked as fundamental’), and ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if they were sacrificed,’ Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937). Second, we have required in substantive-due-process cases a ‘careful- description’ of the asserted fundamental liberty interest. [Reno v. Flores, 507 U.S. 292, 302 (1993) ].”
Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).
“It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation’s history and tradition. In this country, no State permitted same-sex marriage until the Massachusetts Supreme Judicial Court held in 2003 that limiting marriage to opposite-sex couples violated the State Constitution. See Goodridge v. Department of Public Health, 440 Mass. 309, 798 N.E.2d 941 [ (2003) ]. Nor is the right to same-sex marriage deeply rooted in the traditions of other nations. No country allowed same-sex couples to marry until the Netherlands did so in 2000.”
Windsor, — U.S. at -, 133 S.Ct. at 2715 (Alito, J., dissenting) (footnote omitted). See also Hernandez v. Robles, 7 N.Y.3d 338, 361, 821 N.Y.S.2d 770, 777, 855 N.E.2d 1, 8 (2006) (“Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.”).[26] See Part I, supra.
*537 Beyond the obvious historical problem with labeling marriage as defined by the Searcy I plaintiffs a fundamental right, there exists another logical problem with doing so. Proponents of same-sex marriage repeatedly contend that extending the benefits of marriage to their relationships carries no religious or moral dimension and therefore does not constitute a fundamental shift in the social fabric of America, because marriage, as far as the government is concerned, is simply a civil acknowledgment of a legal bond: See Goodridge v. Dep’t of Pub. Health, 440 Mass. 309, 321, 798 N.E.2d 941, 954 (2003) (“We begin by considering the nature of civil marriage itself. Simply put, the government creates civil marriage.... [CJivil marriage is, and since pre-Colonial days has been, precisely what its name implies: a wholly secular institution.”).[27] If marriage truly is nothing more than a state-granted legal license, it is difficult to see how it could rise to the status of a fundamental right of such importance that the United States Constitution prohibits states from approving only the - historically accepted understanding 'of the institution.
Before we follow the proponents of same-sex marriage down the road toward finding their new definition of marriage constitutionally significant (but somehow socially innocuous), we need to know what characteristic of marriage is so fundamental that it warrants constitutional protection. As the Glucksberg Court observed: “[A] ‘careful description’ of the asserted fundamental libérty interest” is required in substantive-due-process cases. 521 U.S. at 721. Although it is undeniable that the institution of marriage is fundamental,[28] it is also undeniable that several aspects of marriage are not treated as fundamental.[29] *538 The United States Supreme Court observed in Windsor that
*539 “[m]arriage laws vary in some respects from State to State. For example, the required minimum age is 16 in Vermont, but only 13 in New Hampshire. Compare Vt. Stat. Ann., Tit. 18, § 5142 (2012), with N.H.Rev.Stat. Ann. § 457:4 (West Supp.2012). Likewise the permissible degree of consanguinity can vary (most States permit first cousins to marry, but a handful — such as Iowa and Washington, see Iowa Code § 595.19 (2009); Wash. Rev.Code § 26:04.020 (2012) — prohibit the practice).”
Windsor, — U.S. at -, 133 S.Ct. at 2691-92. No one contends (yet) that state age and consanguinity requirements violate a fundamental right to marriage even though such requirements clearly limit a person’s choices as to whom the person may marry. What differs, then, about the claims of same-sex paitners? What of their relationship rises to the level of a constitutional right with which the states allegedly may not interfere?
One possible answer is the act of sex, albeit absent potential procreative consequences. The United States Supreme Court has stated that sexual intercourse is protected by the right to privacy allegedly embedded in the “substantive” component of the Due Process Clause. Indeed, this was the constitutional basis for the Court’s striking down state sodomy laws in Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). But the Lawrence Court did so under the rationale that government had no interest in interfering with the sexual conduct of consenting adults in the privacy of their bedrooms.[30] That rationale does not work here because same-sex partners expressly seek public state-government approval of their relationships. In other words, in Lawrence the protected constitutional interest was personal privacy, but here the Searcy I plaintiffs alleged that there is a constitutional interest in the public recognition of unions between couples of the same sex that overrides any interest Alabama has in limiting such unions to opposite-sex couples. Neither Lawrence, nor Windsor, nor any other decision of the United States Supreme -Court has found such a fundamental right, and such a right cannot with any logic be embedded in the so-called right to privacy that has been trumpeted by the Supreme Court since Griswold.
Another possible answer to the question is love. Under this theory, a person has a right to marry the person he or she loves regardless of that person’s gender. This notion has broad public appeal and is, perhaps, the mantra most repeated in public discussions of this matter. But although love may be an important factor in a lasting marriage, civil marriage has no public interest in whether the people seeking a marriage license love one another. “[N]o State in the country requires couples, whether gay or straight, to be in love.” DeBoer, 772 F.3d at 407. State govern- *540 merits do not inquire about whether couples love each other when they seek a marriage license, nor do governments have any justifiable reason to do so. Moreover, if love was the sine qua Turn of marriage, then polygamy also would be constitutionally protected because
“there is no reason to think that three or four adults, whether gay, bisexual, or straight, lack the capacity to share love, affection, and commitment, or for that matter lack the capacity to be capable (and more plentiful) parents to boot. If it is constitutionally irrational to stand by the man-woman definition of marriage, it must be constitutionally irrational to stand by the monogamous definition of marriage.”[31]

Id.

Proponents of the new definition of marriage therefore leave us with an untenable contradiction. On the one hand, they insist that expanding the definition of marriage to include relationships between members of the same sex constitutes nothing more than offering marriage licenses to another class of individuals. It is akin to modifying the age of consent for marriage or changing the length of residency required in a state before one can receive a marriage license, changes that are wholly within state government’s power to modify, without altering the nature of marriage. On the other hand, proponents of same-sex marriage contend that this new definition of marriage is so fundamental that the Constitution prohibits states from maintaining the traditional definition of marriage, yet they are unable to articulate a fundamental element of their definition of marriage that would justify government sponsorship of it. Thus, under their own theory, either the aspect of marriage the same-sex partners insist should be included in the institution is not fundamental to its nature, in which case Alabama’s laws enforcing the traditional definition of marriage are not unconstitutional, or marriage is a fundamental right but the characteristics upon which same-sex partners necessarily must hinge their definition of marriage fail to explain government’s interest in marriage.
Having discarded candidates for what aspect of marriage is so fundamental that it warrants constitutional protection, we are left with the characteristic that has remained unchanged throughout history: marriage has always been between members of the opposite sex. The obvious reason for this immutable characteristic is nature. Men and women complement each other biologically and socially. Perhaps even more obvious, the sexual union between men and women (often) produces children.[32] Marriage demonstrably channels the results of sex between members of the opposite sex — procreation—in a socially advantageous manner.[33] It creates the family, the institution that is almost *541 universally acknowledged to be the building block of society at large because it provides the optimum environment for defining the responsibilities of parents and for raising children to become .productive members of society. See, e.g., Lehr v. Robertson, 463 U.S. 248, 256-57, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (“The institution of marriage has played a critical role both in defining the legal entitlements of family members and in developing the decentralized structure of our democratic society- [A]s part of their general overarching concern for serving the best interests of children, state laws almost universally express an appropriate preference for the formal family.”); Smith v. Organization of Foster Families For Equal. & Reform, 431 U.S. 816, 843-44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (“[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘promoting) a way of life’ through the instruction of children.” (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-33, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972))); Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207, 87 L.Ed. 279 (1942) (“The marriage relation creates problems of large social importance. Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of [the] commanding problems_”). In short, government has an obvious interest in offspring and the consequences that flow from the creation of each new generation, which is only naturally possible in the opposite-sex relationship, which is the . primary reason marriage between men and women is sanctioned by State law.
In his dissent in Goodridge, Judge Cor-dy summarized well many of the public purposes of traditional marriage, and, therefore, why traditional marriage is a rational state policy:
“Civil marriage is the institutional mechanism by which societies have sanctioned and recognized particular family structures, and the institution of marriage has existed as one of the fundamental organizing principles of human society. See C.N. Degler, The Emergence of the Modern American Family, in The American Family in Social-Historical Perspective 61 (3d ed.1983); A.J. Hawkins, Introduction, in Revitalizing the Institution of Marriage for the Twenty-First Century: An Agenda for Strengthening Marriage xiv (2002); C. Lasch, Social Pathologists and the Socialization of Reproduction,, in The American Family in Social-Historical Perspective, [61,] at 80 [ (3d ed.1983) ]; W.J. O’Donnell & D.A. Jones, Marriage and Marital Alternatives 1 (1982); L. Saxton, The Individual, Marriage, and the Family 229-230, 260 (1968); M.A. Schwartz & B.M, Scott, Marriages and Families: Diversity and Change 4 (1994); Wardle, ‘Multiply and Replenish’: Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol’y 771, 777-780 (2001); J.Q. Wilson, The Marriage Problem: How Our Culture Has Weakened Families 28, 40, 66-67 (2002). Marriage has not been merely a contractual arrangement for legally defining the private relationship between two individuals (although that is certainly part of any marriage). Rather, on an institutional level, marriage is the ‘very basis of the whole fabric of civilized society,’. J.P. Bishop, Commentaries on the Law of Marriage and Divorce, and Evi *542 dence in Matrimonial Suits § 32 (1852), and it serves many important political, economic, social, educational, procreational, and personal functions.
“Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized. See Milford v. Worcester, 7 Mass. 48, 52 (1810) (civil marriage ‘intended to regulate, chasten, and refíne, the intercourse between the '•sexes; and to multiply, preserve, and improve the species’). See also P. Blumstein & P. Schwartz, American Couples: Money, Work, Sex 29 (1983); C.N. Degler, supra at 61; G. Douglas, Marriage, Cohabitation, and Parenthood — From Contract "to Status?, in Cross Currents: Family Law and Policy in the United States' and England 223 '(2000); S.L. Nock, The Social Costs of De-Institutionalizing Marriage, in Revitalizing the Institution of Marriage for [1] the Twenty-First Century: An Agenda for Strengthening Marriage, supra at 7; L. Saxton, supra at 239-240, 242; M.A. Schwartz & B.M. Scott, supra at 4-6; Wardle, supra at 781-796; J.Q. Wilson, supra at 23-32. Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined (particularly in the modern age of widespread effective contraception and supportive social welfare programs), but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism.
“The institution of marriage provides the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed. See G.L. c. 209C, § 6 (‘a man is presumed to be the father of a child ... if he is or has been married to the mother and the child was born during the marriage, or within three hundred days after the marriage was terminated by death, annulment or divorce’). Whereas the relationship between ’ mother and child is demonstratively and predictably created and recognizable through the biological process of pregnancy and childbirth, there is no corresponding process for creating a relationship between father and child. Similarly, aside from an act of heterosexual intercourse nine months prior to childbirth, there is no process for creating a relationship between a man and a woman as the parents of a particular child. The institution of marriage fills this void by formally binding the husband-father to his wife and child, and imposing on him the responsibilities of fatherhood. See J.Q. Wilson, supra at 23-32. See also P. Blumstein & P. Schwartz, supra at 29; C.N. Degler, supra at 61; G. Douglas, supra at 223; S.L. Nock, supra at 7; L. Saxton, supra at 239-240, 242; M.A. Schwartz & B.M. Scott, supra at 4-6; Wardle, supra at 781-796. The alternative, a society without the institution of marriage, in which heterosexual intercourse, procreation, and child care are largely disconnected processes, would be chaotic.
“The marital family is also the foremost setting for the education and socialization of children. Children learn about the world and their place in it primarily from those who raise them, *543 and those children eventually grow up to exert some influence, great or small, positive or negative, on society. The institution of marriage encourages parents to remain committed to each other and to their children as they grow, thereby encouraging a stable venue for the education and socialization of children. See P. Blumstein & P. Schwartz, supra at 26; C.N. Degler, supra at 61; S.L. Nock, supra at 2-3; C. Lasch, supra at 81; M.A. Schwartz & B.M. Scott, supra at 6-7. More macroscopically, construction of a family through marriage also formalizes the bonds between people in an ordered and institutional manner, thereby facilitating a foundation of interconnectedness and interdependency on which more intricate stabilizing social structures might be built. See M. Grossberg, Governing the Hearth: Law and Family in Nineteenth-Century America 10 (1985); C. Lasch, supra; L. Saxton, supra at 260; J.Q. Wilson, supra at 221.”
Goodridge, 440 Mass. at 381-84, 798 N.E.2d at 995-96 (Cordy, J., dissenting) (footnote omitted).[34]
*544 Ultimately, these are the purposes of marriage that relate to government. Government is concerned with public effects, not private wishes. The new definition of marriage centers on the private concerns of adults, while the traditional definition focuses on the benefits to society from the special relationship that exists between a man and a woman, i.e., the effects for care of children, the control of passions, the division of wealth in society, and so on.
The federal district court and other courts that have struck down traditional marriage laws have stated that states cannot distinguish traditional marriage on the basis of procreation and the beneficial effects the institution provides to children because some married couples cannot or do not have children, and yet government recognizes their marriages. This argument is nothing more than an attempt to use the exception to disprove the rule.[35] The fact that many people do not 'vote in elections does not invalidate the value of using elections to allow people to chose their government leaders. “Marriage laws are not aimed at making all married sex procreative but only seek to encourage that all man-woman sex occurs in marriage, as a protection for when such sex is procreative — a protection for the baby, the often vulnerable mother, and society generally.” Stewart, 31 Harv. J.L. & Pub. Pol’y at 344-15.[36]
The federal district court’s memorandum opinion in Searcy I states that “[t]he Attorney General fails to demonstrate any rational, much less compelling, link between its prohibition and non-recognition of same-sex marriage and its goal of having more children raised in the biological family structure the state wishes to promote.” But “ ‘the relevant inquiry here is not whether excluding same-sex couples from marriage furthers [the state’s] interest in steering man-woman couples into *545 marriage.’ Rather, the relevant inquiry is whether also recognizing same-sex marriages would further [the state’s] interests.” Bostic, 760 F.3d at 394 (Niemeyer, J., dissentingXquoting state-appellant’s brief). In other words, the state simply has to show that recognizing and encouraging marriage between men and women promotes responsible procreation, not that excluding same-sex couples from marriage encourages heterosexuals to marry. Even if preventing homosexuals from marrying will not increase the likelihood that children are born in wedlock, this does not address the fact that offering marriage solely to heterosexuals indisputably serves as a tool to prevent out-of-wedlock pregnancies. Moreover, the state’s policy need only advance a rational goal; it does not need to demonstrate that it is the only way to advance the goal or even that it is the best way to do so. “[R]ational' basis review does not permit courts to invalidate laws every time a new and allegedly better way of addressing a policy emerges.” DeBoer, 772 F.3d at 405.
Under United States Supreme Court precedent, another potential method of finding traditional marriage unconstitutional is the notion that Alabama’s limitation of marriage to heterosexual unions is based solely on animus toward homosexuals and that, therefore, the laws violate both the Equal Protection Clause and the Due Process Clause. The federal district court did not expressly articulate this position, but doing so would require reliance upon Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), Lawrence, and Windsor.
In Romer,- the Supreme Court struck down an amendment to the Colorado Constitution that “prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect” the status of persons based on their “ ‘homosexual, lesbian or bisexual orientation, conduct, practices or relationships.’ ” 517 U.S. at 624. The Court did so because the amendment “singl[ed] out a certain class of citizens for disfavored legal status,” 517 U.S. at 633, and “raise[d] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.” 517 U.S. at 634. In short, the amendment “classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else.” 517 U.S. at 635.
In Lawrence, • the Court struck down a Texas law criminalizing sodomy because, it said, homosexuals “are entitled to respect for their private’lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime.” 539 U.S. at 578.
In Windsor, the Court struck down a portion of the Federal Defense of Marriage Act (“DOMA”) because Congress’s intrusion into a traditional state-law area demonstrated that DOMA was “motived by an improper animus.” — U.S. at -, 133 S.Ct. at 2693. The Court explained that DOMA’s aim was to “interfere! ] with the equal dignity of same-sex marriages” conferred by New York’s laws on marriage. Id. The Court added that “DOMA’s principal effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency.” — U.S. at -, 133 S.Ct. at 2694. In short, “the principal purpose and the necessary effect of [DOMA] are to demean those *546 persons who are in a lawful same-sex marriage.” — U.S. at -, 133 S.Ct. at 2695.[37]
The theme from Romer, Lawrence, and Windsor that government cannot single out a group for disfavored treatment solely on the basis of hatred for that particular group does not apply to Alabama’s marriage laws. Although Alabama’s limitation of marriage to opposite-sex couples prevents homosexual couples from receiving marriage licenses, the laws do not do so for the purpose of singling out same-sex partners for disfavored status. As we have already seen, the marriage laws undeniably have several purposes that have absolutely nothing to do with attempting to treat a particular group in an unequal fashion. The laws attempt to protect children produced in opposite-sex relationships; they fashion a system for parental legal responsibilities; and they encourage family structure and enable formative education and socialization of children. The limitation of marriage to opposite-sex couples has so long existed in law that ascribing its existence solely to hatred toward homosexuals is simply absurd on its face. See Lawrence, 539 U.S. at 570 (“American laws targeting same-sex couples did not develop until the last third of the 20th century.”). Even Alabama’s marriage amendment, which is of a more recent vintage,
“codified a long-existing, widely held social norm already reflected in state law. ‘[Mjarriage between a man and a woman,’ as the Court reminded us just last year, ‘had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.’ Windsor, 133 S.Ct. at 2689.”
DeBoer, 772 F.3d at 408. Alabama’s longstanding and continued embrace of traditional marriage is not due to be struck down on an animus rationale.
If Alabama’s marriage laws do not violate the Equal Protection Clause or the fundamental right to marry under-the Due Process Clause, and if they are not solely the product of animus toward homosexuals, then Supreme Court precedent provides only one other course to justify the conclusion reached by the federal district court: The notion that marriage confers a certain dignity on its participants that the law cannot deprive individuals of simply because they desire to marry a person of the same sex. This line of reasoning comes from Windsor. In Windsor, the Court stated:
“Here [New York’s] decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import. When the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community.
«
*547 “... DOMA undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see Lawrence, 539 U.S. 558, 123 S.Ct. 2472, and whose relationship the State has sought to dignify.”
Windsor, — U.S. at —, 133 S.Ct. at 2692, 2694; see also — U.S. at —, 133 S.Ct. at 2693 (“The history of DOMA’s enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute.”).
Several courts that have declared state marriage laws unconstitutional have relied on Windsor’s “equal dignity” language. See, e.g., Baskin v. Bogan, 766 F.3d 648, 671 (7th Cir.2014) (emphasizing Windsor’s statement that “‘no legitimate- purpose overcomes the purpose and effect to disparage and injure those whom the State, by its marriage laws, sought to protect in personhood and dignity”’ (quoting Windsor, — U.S. at —, 133 S.Ct. at 2696; further citation omitted)); Kitchen v. Herbert, 755 F.3d 1193, 1213 (10th Cir.2014) (stating that “freedoms [such as marriage] support the dignity of each person, a factor emphasized by the Windsor Court”); Garden State Equal. v. Dow, 434 N.J.Super. 163, 206, 82 A.3d 336, 361 (Ch.Div.2013) (relying on Windsor’s language that a “ ‘[sjtate’s decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import’ ” (quoting Windsor, — U.S. at —, 133 S.Ct. at 2705)).
Windsor’s “equal dignity” rationale contains several problems. First, there is no “equal dignity” provision in the text of the United States Constitution. Instead, what this notion appears to be is a legal proxy for invalidating laws federal judges do not like, even though no actual constitutional infirmity exists.[38] Since the notion is not textual, it is at least incumbent upon federal courts employing it to strike down state-marriage laws to describe in concrete terms what “dignity” state-sanctioned marriage confers and therefore exactly what same-sex couples are deprived of by traditional marriage' laws.[39] But those courts merely repeat the generalized language of Windsor. Does a paper license that publicly recognizes the relationship confer “dignity” upon those who obtain it? Is it the fact that government recognition of same-sex relationships declares them to *548 be “the same as” opposite-sex relationships that confers dignity? The United States Supreme Court has held that damage to reputation is not a cognizable interest protected by the Fourteenth Amendment. See Paul v. Davis, 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that “the interest in reputation ... is neither ‘liberty’ nor ‘property* guaranteed against state deprivation without due process of law”). So presumably this notion must be something more than reputation, but it is apparently too difficult for the judges relying on it to describe what it is. If the notion of “equal dignity” is a backdoor way of according fundamental-right status to the new definition of marriage, it utterly fails to cabin that right in any meaningful way.
Furthermore, emphasizing the “dignity” of the public recognition of a marriage places the focus on the adult relationship, again assuming the conclusion as a premise for the question. It constitutes an implicit adoption, without acknowledgment, of the new definition of marriage based solely on a special relationship between two adults — as opposed to the traditional definition of marriage, which aligns with the historically recognized purpose relating to procreation and the “rights and obligations between the couple and any children the union may produce.” Maggie Gallagher, What Is Marriage for? The Public Purposes of Marriage Law, 62 La. L.Rev. 773, 781 (2002).
“Plaintiffs seek, to bring the right to marry the person of their choosing regardless of gender within the protection of the well-recognized fundamental right to marry (see Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673 [ (1978) ]; Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817 [ (1967) ]; Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 [ (1942) ]). However, we find merit in defendants’ assertion that this case is not simply about the right to marry the person of one’s choice, but represents a significant expansion into new territory which is, in reality, a redefinition of marriage. The cornerstone cases acknowledging marriage as a fundamental right are laced with language referring to the ancient recognized nature of. that institution, specifically tying part of its critical importance to its role in procreation and, thus, to the union of a woman and a man....”
Samuels v. State Dep’t Of Health, 29 A.D.3d 9, 14-15, 811 N.Y.S.2d 136, 140-41 (N.Y.App.Div.2006) (footnote omitted), aff'd sub nom., Hernandez v. Robles, 7 N.Y.3d 338, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006).
Related to the fact that Windsor implicitly adopts the new definition of marriage is the fact that Windsor’s “equal dignity” rationale necessarily makes a moral judgment about adult sexual relationships, even though the Supreme Court in Lawrence and lower courts addressing the marriage issue have purported to disclaim ascribing any merit to moral or religious considerations.[40] By asserting that denying same-sex couples the status of marriage deprives them of “a dignity and status of immense import,” — U.S. at -, 133 *549 S.Ct. at 2692, the Windsor Court made a moral judgment that a married couple has more dignity than an unmarried couple.[41] Many people would agree with such an assessment, but it is not, strictly speaking, a legal judgment — at least according to several courts that have invalidated traditional marriage laws.[42] It seems at least disingenuous to find a constitutional infirmity with traditional marriage laws by way of a moral judgment when states have been forced to defend those laws apart from any moral or religious basis, an especially difficult task given that American ideas of marriage indisputably have been shaped by the Jewish and Christian religions. See Charles P. Kindregan, Jr., Same-Sex Marriage: The Cultural Wars and the Lessons of Legal History, 38 Fam. L.Q. 427, 428 (2004) (detailing the intertwining history of religious and civil marriage in America and stating that “[t]he Western concept of marriage has been strongly influenced by Judeo-Christian theology”). Moreover, because the Windsor Court’s moral judgment is (one must assume) not based on religion, then it must be asked what standard is being used to *550 judge that marriage is better than non-marriage, that it contains some kind of higher dignity than other relationships?[43] Because the notion is not contained in the Constitution, one may question whether it ■is nothing more than intuitions.[44] At any rate, it is not a legal basis for striking down a validly enacted law.
In the end, however, even if one were to accept that marriage carries with it a “dignity”' that compels its availability to all, would we not meet ourselves coming? Under that construct, such dignity no doubt would be something gained from the very nature of traditional marriage, the foundation for the family unit within which children may be born and have imparted to them by a mother and father the values needed for responsible citizenship and the furtherance of society.
“To remove from ‘marriage’ a definitional component of that institution (i.e., one woman, one man) which long predates the constitutions of this country and state (see e.g. Griswold v. Connecticut, 381 U.S. 479, 486[, 85 S.Ct. 1678, 14 L.Ed.2d 510] [1965]) would, to a certain extent, extract some of the ‘deep[] root[s]’ that support its elevation to a fundamental right.”
Samuels v. State Dep’t of Health, supra.
Finally, an open question exists as to whether Windsor’s “equal dignity” notion works in the same direction toward state laws concerning marriage as it did toward DOMA. The Windsor Court stated that “[t]he history of DOMA’s enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute.” Windsor, — U.S. at -, 133 S.Ct. at 2693. In Windsor, New York’s law allowed same-sex couples to obtain marriage licenses. Thus, the “dignity” was conferred by the state’s own choice, a choice that was “without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended.” — U.S. at -, 133 S.Ct. at 2692. The problem with DOMA was that *551 it interfered with New York’s “sovereign” choice. Alabama “used its historic and essential authority to define the marital relation” and made a different “sovereign” choice than New York. Id. If New York was free to make that choice, it would seem inconsistent to say that Alabama is not free to make its own choice, especially given that “[t]he recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens.” — U.S. at -, 133 S.Ct. at 2691.
To all of this, proponents of same-sex marriage often retort that there is no reason both the traditional definition and the new definition of marriage cannot coexist. On one level, that argument makes the erroneous assumption that the ;two definitions are not making different claims as to why marriage exists. On another level, it simply assumes that the definitions are not mutually exclusive.[45]
Redefining marriage' by definition implies that the traditional definition is inaccurate. In point of fact, we are concerned here with two different, mutually exclusive definitions. One that marriage is only between a man and a woman, and one that does not include this limitation. Both definitions cannot be true at the same time. Insisting that the law must legitimize one definition necessarily delegitimizes the other.
Throughout the entirety of its history, Alabama has chosen the traditional definition of marriage. Some other states, like New York, have more recently chosen the new definition. The United States Constitution does not require one definition or the other because, as the Windsor Court noted, “[b]y history and tradition,” and one should add, by the text of the Constitution, “the definition and regulation of marriage ... has been treated as being within the authority and realm of the separate States.” — U.S. at — , 133 S.Ct. at 2689-90. That fact does not change simply because the new definition of marriage has gained ascendancy in certain quarters of the country, even if one of those quarters is the federal judiciary.[46]
*552 As it has done for approximately two centuries, Alabama law allows for “marriage” only between one man and one woman. Alabama probate judges have a ministerial duty not to issue any marriage license contrary to this law. Nothing in the United States Constitution alters or overrides this duty.
IV. Order
The named respondents are ordered to discontinue the issuance of marriage licenses to same-sex couples. Further, and pursuant to relator Judge Enslen’s request that this Court, “by any and all lawful means available to it,” ensure compliance with Alabama law with respect to the issuance of marriage licenses, each of the probate judges in this State other than the named respondents and Judge Davis are joined as respondents in the place of the “Judge Does” identified in the petition. Within five business days following the issuance of this order, each such probate judge may file an answer responding to the relator’s petition for the writ of mandamus and showing cause, if any, why said probate judge should not be bound hereby. Subject to further order of this Court upon receipt and consideration of any such answer, each such probate judge is temporarily enjoined from issuing any marriage license contrary to Alabama law as explained in this opinion.
As to Judge Davis’s request to be dismissed on the ground that he is subject to a potentially conflicting federal court order, he is directed to advise this Court, by letter brief, no later than 5:00 p.m. on Thursday, March 5, 2015, as to whether he is bound by any existing federal court order regarding the issuance of any marriage license other than the four marriage licenses he was ordered to issue in Straw-ser.
PETITION GRANTED; WRIT ISSUED.**
STUART, BOLIN, PARKER, MURDOCK, WISE, and BRYAN, JJ., concur.
MAIN, J., concurs in part and concurs in the result.
SHAW, J., dissents.

. Realignment of the parties in civil actions in Alabama is not uncommon. See, e.g., Richards v. Izzi, 819 So.2d 25, 28 (Ala.2001) (“Jefferson County, although originally a defendant, was realigned as a plaintiff.”). Realignment is not uncommon, even when the jurisdiction of the court is called into question. Indeed, when cases are removed to federal court based on diversity jurisdiction, federal courts allow post-removal realignment of parties in order to create diversity. See Lott v. Scottsdale Ins. Co., 811 F.Supp.2d 1220, 1223 (E.D.Va.2011) (noting that "[t]he first question presented — whether post-removal party realignment to create diversity is permissible — is easily answered in the affirmative based on settled authority in this circuit and elsewhere” and providing footnote citing multiple authorities). In this regard, the United States Court of Appeals for the Eleventh Circuit has observed:
"[Fjederal courts are required to realign the parties in an action to reflect their interests in the litigation. The parties themselves cannot' confer diversity jurisdiction upon the federal courts by their own designation of.plaintiffs and defendants. City of Indianapolis v. Chase Nat’l Bank, 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47 (1941). This Court concludes thát the converse of this principle — that parties cannot avoid diversity by their designation of the parties— is also true. Rather it is the 'duty ... of the lower federal courts [] to look beyond the pleadings and arrange the parties according to their sides in the dispute,' Northbrook Nat'l Ins. Co. v. Brewer, 493 U.S. 6, 16 n. 5, 110 S.Ct. 297, 302 n. 5, 107 L.Ed.2d 223 (1989) (citations and quotations omitted), as determined by 'the principal purpose of the suit’ and 'the primary and controlling matter in dispute,' City of Indianapolis, 314 U.S. at 69, 62 S.Ct. 15.”
City of Vestavia Hills v. General Fid. Ins. Co., 676 F.3d 1310, 1313-14 (11th Cir.2012) (emphasis omitted). As the Eleventh Circuit explained, it is a court’s duty to align the parties on their proper sides without regard to the effect of the realignment on jurisdiction. By doing so,'we merely “ ' "look beyond-the [nomenclature of the] pleadings .and arrange the parties according to their sides in the dispute.” ’ ” Northbrook Nat’l Ins. Co. v. Brewer, 493 U.S. 6, 16 n. 5, 110 S.Ct. 297, 107 L.Ed.2d 223 (1989) (quoting other cases).

. "For better, for worse, or for more of the same, marriage has long been a social institution defined by relationships between men and women. So long defined, the tradition is measured in millennia, not centuries or decades. So widely shared, the tradition until recently had been adopted by all governments and major religions of the world.”
DeBoer v. Snyder, 772 F.3d 388, 395-96 (6th Cir.2014).
As Blackstone stated: “[T]he most universal relation in nature” is that between a parent and child, and that relationship proceeds from the first natural relation, that between husband and wife. 1 William Blackstone, Commentaries *446. The "main end and design of marriage” is "to ascertain and fix upon some certain person, to whom the care, protection, the maintenance, and the education of the children should belong.” Id. at *455. And those duties are duties of natural law. Id. at *447-50.

. The history of the Searcy litigation appears to be yet another manifestation of the confusion that has been generated by this matter. According to the complaint in Searcy I, the plaintiffs, C.D.S, and K.M., a same-sex couple, had been married in California, and K.S. was K.M.'s biological son. In December 2011, C.D.S, filed a petition in the Mobile Probate Court seeking to adopt K.S. under a provision of Alabama’s adoption code that allows a person .to adopt a "spouse’s child.” § 26-10A-27, Ala.Code 1975.
In April 2012, the Mobile Probate Court, acting through Judge Don Davis, entered a *508 final judgment denying C.D.S.’s petition for adoption as a matter of law based on the Amendment and the Act. C.D.S. appealed, and the Court of Civil Appeals affirmed the April 2012 judgment. See In re K.R.S., 109 So.3d 176 (Ala.Civ.App.2012). C.D.S. did not seek further appellate relief.
In May 2014, C.D.S. and K.M. filed their complaint in Searcy I; the defendants included Attorney General Strange and Mobile Probate Judge Davis, among others. The complaint sought an order requiring, among other things, that the defendants grant the adoption of K.S. by C.D.S. The claims against Judge Davis were subsequently dismissed with prejudice. It is unclear to this Court whether the claims against Judge Davis were dismissed because he would function as a court of law, rather than as an executive minister of the law, in relation to any petition within the state judicial system seeking an adoption. (Alternatively, it is unclear whether the claims against Judge Davis were dismissed because the final judgment he entered in April 2012, based as it was on a matter of law, represented a res judicata bar to the relief being sought in the federal court in Searcy I.) By the same token, it is unclear on what basis a “case or controversy” existed between the plaintiffs in Searcy I and the Attorney General given the Attorney General's lack of authority to affect the actions of the court of law responsible for adjudicating adoption cases. See also note 16, infra.

. The opinion in Alabama Textile did note that the parties agreed that it was necessary to complete relief that the Court act, but as discussed below, that agreement was considered by the Court only in making the discretionary determination delegated by law to the Court with respect to whether action by it was necessary to provide the relief needed. Ultimately, and most importantly as to this point, the Court was quite clear in its conclusion that such consent is neither necessary nor sufficient to such a determination.

. In Ex parte Jim Walter Resources, Inc., 91 So.3d 50 (Ala.2012), the Court considered the question whether it had original jurisdiction over an original petition filed in this Court seeking a writ of mandamus to direct a probate judge to record a mortgage document. The Tuscaloosa County Probate Court had refused to record the mortgage documents filed by Jim Walter Resources ("JWR") unless a recordation tax was first paid. See § 40-22-2, Ala.Code 1975. We explained that “imposing the recordation tax on a mortgage recorded in a county is part of the administra-five duties of the probate judge of the county and, as such, is a ministerial function,” and that "[a] writ of mandamus will lie to compel a court to perform ministerial duties.” Jim Walter, 91 So.3d at 53. Further, we explained our ability to exercise our original jurisdiction Over the petition filed with us by explaining that a circuit court’s appellate jurisdiction over probate matters is limited under § 12-22-21, Ala.Code 1975, and did not include the taxing issue involved in that case. Id.

. Rarely, if ever, could a party attempt to bring a viable public-interest action in the name of the state for the purpose of challenging the state’s laws, because the state normally would have no interest in such an action. Thus, public-interest standing generally is limited to cases in which a relator seeks on behalf of the state to secure the enforcement of the state’s laws. See discussion of cases below. Where a party seeks to halt enforcement of a duty otherwise owed to the public, as is common in an action seeking to invalidate a state statute, he or she generally must be able to show a private interest to be vindicated. See, e.g., Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d at 1256 (action seeking to invalidate a state statute) (noting that "[i]n Jones v. Black, 48 Ala. 540 (1872), this Court first articulated a test for determining whether a party has the necessary standing,” and explaining that " ‘[a] party who seeks to have an act of the legislature declared unconstitutional, must ... show that he is, or will be injured by it’ ” (quoting Jones, 48 Ala. at 543)); Alabama Alcoholic Beverage Control Board v. Henri-Duval Winery, L.L.C., 890 So.2d at 74 (stating that "[a] party establishes standing to bring a challenge” to a state statute when it demonstrates the Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), elements). Compare, e.g., State ex rel. Highsmith v. Brown Serv. Funeral Co., 236 Ala. 249, 251, 182 So. 18, 19 (1938) (allowing the suit to go forward on other grounds, but agreeing with the defendants' general assertion that "relator shows no interest in the controversy, and that one without interest cannot attack an act of the Legislature because it is unconstitutional, which is the attack here made”).

. See also State ex rel. Bronster v. Yoshina, 84 Haw. 179, 185, 932 P.2d 316, 322 (1997) ("[SJtanding barriers should not serve to bar cases of public interest under our jurisdiction. More specifically, 'federal justiciability stan- ■ dards are inapplicable in state court declaratory- judgment actions involving matters of great public importance.’ " (citation omitted)); State ex rel. Twenty-Second Judicial Circuit v. Jones, 823 S.W.2d 471, 475 (Mo.1992) (“The threshold requirement for standing is extremely low where mandamus is brought to enforce a nondiscretionary duty allegedly required of a public official.... Even a private citizen was held to have 'the sesame which unlocks the gates - of mandatory authority whenever an, officer whose functions are purely ministerial refuses to perform his office.’ ” (citation omitted)); and State ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 363, 524 P.2d 975, 979 (1974) ("[I]t has been clearly and firmly established that even though a private party may not have standing to invoke the power of this Court to resolve constitutional questions and enforce constitutional compliance, this Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." (emphasis added)).

. Though it may appear that the duty involved in Rodgers was one owed to the government, i.e., to the circuit clerk, the purpose of requiring the sheriff to file the reports was because the public had an interest in knowing who had been committed to and discharged from the prisons.

. The fact that two of the relators here are public-interest, nonprofit corporate entities rather than natural persons does not disqualify them as plaintiffs. See, e.g., Marone, 967 N.Y.S.2d at 589, 39 Misc.3d at 1041 ("The public interest standing of a citizen has been extended to corporations as well as other organizations.”); Save the Plastic Bag Coalition v. City of Manhattan Beach, 52 Cal.4th 155, 168, 127 Cal.Rptr.3d 710, 720, 254 P.3d 1005, 1013 (2011) ("[CJorporate entities should be as free as natural persons to litigate in the public interest.”); State ex rel. Ohio Motorists Ass'n v. Masten, 8 Ohio App.3d 123, 129, 456 N.E.2d 567, 573 n. 4 (1982) ("We are persuaded that an Ohio corporation may have as great an interest as a natural person in seeking the just enforcement of state laws, and may be considered to be a citizen of the state of Ohio entitled to institute an action in mandamus.”); cf. Jackson Sec. & Inv. Co. v. State, 241 Ala. 288, 292, 2 So.2d 760, 764 (1941) ("The general rule is recognized everywhere that a corporation is a citizen, resident or inhabitant of the state under whose laws it was created.”); ánd § 10A-l-2.il, Ala.Code 1975 ("[W]hether or not expressly stated in its governing documents, a domestic entity has the same powers as an individual to take action necessary or convenient to carry out its business and affairs.”).

. In a- different sense of the public's "interest,” the intensity of the public's interest in preserving the institution of marriage as it has always been understood, a union between one man and one woman, is evidenced by the ratification of the Amendment in 2006 by 81% of Alabama voters. Certification of Constitutional Amendment Election Results (June 6, 2006), http://www.alabamavotes.gov/ downloads/election/2006/primary/Proposed Amendments-OfficialResultsCertification-06-28-2006.pdf (last visited March 2, 2015; a copy of the Web page containing , this information is available in the case file of the Clerk of the Alabama Supreme Court).

. Other matters that arguably fall into the category of a state’s sovereign rights include the power of eminent domain, see West River Bridge Co. v. Dix, 47 U.S. (6 How.) 507, 533, 12 L.Ed. 535 (1848) (recognizing that “the power [of eminent domain] ... remains with the States to the full extent in which it inheres in every sovereign government, to be exercised by them in that degree that shall be ... deemed commensurate with public necessity”), and the power to enforce criminal laws, see United States v. Wheeler, 435 U.S. 313, 320, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (observing that both the federal and state governments had "the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each 'is exercising its own sovereignty, not that of the other’ ”) (quoting United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922)).

. Even Lujan itself, at least on its facts, is not inconsistent with the understanding that a private right is needed when one seeks to assert a claim based on a duty owed to the government as such. Clearly, Lujan is not easily assessed, and some have questioned the consistency of application of the principles expressed therein, even in federal cases. See, e.g., Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 641-42, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (Souter, J., dissenting) (stating that " ‘the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition,' leaving it impossible ‘to make application of the constitutional standing requirement a mechanical exercise’ ” (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014))); Gene R. Nichol, Jr., Standing for Privilege: The Failure of Injury Analysis, 82 B.U. L.Rev. 301, 302-04 (2002) (observing that Lujan's ‘‘easily-stated formula hides much of the complexity of modem case or controversy analysis). (Of course, a state is free to reject or modify Lujan as it may see fit. See, e.g., ASARCO, Inc. v. Kadish, 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (“[T]he state judiciary here chose a different path, as was their right, and took no account of federal standing rales in letting the case go to final judgment in the Arizona courts.”).) One possible explanation for the seemingly disparate results achieved is that some cases, including Lujan and the cases upon which it relies, may be understood as involving attempts by private litigants to state a cause of action by relying upon duties actually owed to a governmental unit, commonly by another govern- ■ mental unit, whereas others involve what may be understood as seeking to enforce a duty more directly owed to the public. Compare *526 Lujan; Fairchild v. Hughes, 258 U.S, 126, 42 S.Ct. 274, 66 L.Ed. 499 (1922); Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014)); Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); and Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (duty sued upon was owed to a person other than the plaintiff), with Federal Election Comm'n v. Akins, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)(seeking to require compliance with anti-pollution laws); and Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (recognizing standing in several environmental groups seeking to enforce a duty imposed on the EPA to regulate certain carbon-dioxide emissions). See generally Union Pac. R.R. v. Hall, 91 U.S. 343, 23 L.Ed. 428 (1875) (holding that a member of the public may bring a mandamus petition to enforce a public duty and need not possess a particularized interest in the duty).

. Mooring v. State, 207 Ala. 34, 91 So. 869 (1921), and Tarver v. Commissioners' Court, 17 Ala. 527, 531 (1850), are among the examples of cases implicating the State’s sovereign right of taxation in which a private party was permitted to bring a mandamus petition to force a government entity to collect a tax precisely because the party had a private interest in the tax collected. At issue in Tarver was a statute that provided;
'* 'That it shall be lawful for the commissioners’ court of roads and revenue of the county of Tallapoosa to impose such tax in addition to the tax levied for county purposes, as may be necessary to pay any amount of money that the court-house commissioners of said county may be liable to pay for building the court-house and jail.’ Under the authority of these several acts, [Tarver] with the other commissioners contracted with Cameron & Mitchell for the erection of the county buildings, agreeing to pay them $18,000. The buildings were completed and were received and used by the county. The [Commissioners Court of Tallapoosa County] paid from the proceeds of the sale of the lots the amount agreed on, less the sum of thirty-five hundred dollars. This amount they declined paying on the ground that the work was not completed according to'contract. A suit was instituted against [Tarver and the other commissioners] and a judgment finally rendered for twenty-five hundred dollars. The commissioners’ court has levied a tax and paid a part of this judgment, but refuses to pay any more or to levy a tax for that purpose."
17 Ala. at 531. All the commissioners besides Tarver at the time the contract was executed died or left the State, and consequently execution of the judgment was made solely against Tarver. Tarver brought a mandamus petition under the authority of the statute to force the current Commissioners of the Court of Talla-poosa County to levy a tax to pay the judgment against him. The circuit court dismissed the petition. On appeal, this Court granted the petition, stating:
*527 "We think it very clear that it is the duty of the commissioners’ court under these facts to levy and collect a tax sufficient to pay the amount of the judgment still unpaid, as well as such amount as may be justly due to the petitioner, and that he has the legal right to demand of them the performance of this duty.”
17 Ala. at 531.

. Nor would it be of any import for purposes of this proceeding that it was initiated only by the associational relators and not also Judge Enslen. Judge Enslen is a proper party before this Court and has been properly realigned as a relator on behalf of petitioner State of Alabama. Under the circumstances presented, we are clear to the conclusion that, to the extent our precedents applicable to actions filed in trial courts require their dismissal if filed by a party without standing, those precedents have no application here. Our supervisory authority is sufficient to enable us to effect that realignment and accept jurisdiction over the resulting adversarial proceeding in furtherance of our responsibility to restore and maintain order within our judicial system, particularly where as here the State was originally named petitioner and continues as the petitioner and the realignment of Judge Enslen would, at most, effect merely a substitution of the relating person to speak on its behalf.

. That is, a lower federal court, which has no appellate authority over any state court judge acting in a judicial capacity, has no authority or jurisdiction over a state court’s rulings as to cases before that state court judge acting in his or her judicial capacity, including as to questions of law. That would be the case, for example, as to a probate judge handling an adoption case or an estate-administration case, as opposed to acting in a ministerial capacity to record a deed or to issue a license. The proper avenue, indeed the only avenue, for appellate review of a final trial court judgment in such a case is "upward” through the coordinate state court system, of which that trial court is a part, followed thereafter by a petition for a writ of certiorari to the United States Supreme Court if necessary. By way of example, the plaintiff in Searcy I filed at least one previous petition seeking approval of the adoption of the child at issue. As has been noted, in April 2012, Mobile Probate Judge Davis entered a final trial court order denying that petition on the ground that the requested adoption was not permitted under the Amendment and the Act. C.D.S., as was the proper course, sought relief within the appellate courts of this state. See In re K.R.S., 109 So.3d 176 (Ala.Civ.App.2012).

. " ‘[Regulation of domestic relations' is 'an area that has long been regarded as a virtually exclusive province of the States.’ ” United States v. Windsor, — U.S. at —, 133 S.Ct. at 2691 (quoting Sosna v. Iowa, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). The Windsor Court also observed that " ‘[e]ach state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders.’ ” — U.S. at —, 133 S.Ct. at 2691 (quoting Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207, 87 L.Ed. 279 (1942)).
We note that Windsor's acknowledgment of the states’ sovereign authority over marriage refers to the powers of the states vis-á-vis the federal government. Our discussion in Part II.B of this opinion notes that marriage is a duty owed to the public rather than what on-relation cases such as Kendrick have described as "sovereign rights of the state,” which are duties "owed to the government as such,” The fact that, as between the federal government and the states, the law of marriage falls within the sovereign powers of the states does not affect whether marriage licensing is a duty owed to the public rather than one owed to the government as such.

. Laws that include the concept of marriage as the union of one man and one woman, however, predate the inception of Alabama as a state in 1819. In 1805 — when Alabama was still a part of the Mississippi Territory — the legislature of the Mississippi Territory passed an act imbuing orphans' courts with the power to grant and issue marriage licenses. H. Toulmin, Digest of the Laws of Alabama, tit. 42, ch. 1, § 4 (1823). That act remained in force after the creation of Alabama as a state in 1819 and contained language referring to persons joined together as "man and wife.” See H, Toulmin, Digest of the Laws of Alabama, tit. 42, ch. 1, § 6 (1823). Furthermore, in 1805, the plain, ordinary, and commonly understood meaning of the word "marriage” *531 was "the act of joining: man and woman.” Webster, A Compendious Dictionary of the English Language, 185 (1806). Following Alabama’s becoming a state in 1819, Alabama law continued to include the concept of marriage as the union of one man and one woman. See Hunter v. Whitworth, 9 Ala. 965, 968 (1846) ("Marriage is considered by all civilized nations as the source of legitimacy; the qualities of husband and wife must be possessed by the parents in order to make the offspring legitimate, where the municipal law does not otherwise provide.” (emphasis added)). In 1850, the Alabama Legislature conferred the power to issue marriage licenses to the newly created probate courts. 1850 Ala. Laws 26. This power was officially codified in 1852. See Ala.Code 1852, § 1949.

. Few courts that have ordered the issuance of marriage licenses to same-sex couples appear to have contemplated this issue. The alternative, however, appears to allow the judiciary to declare by judicial fiat a new statutory scheme in place of the old, rather than leaving it to the legislative branch to decide what should take the place of the scheme being stricken, all contrary to well established state and federal principles of judicial review. As we observed in King v. Campbell, 988 So.2d 969, 981-83 (Ala.2007):
"This Court addressed the standard for ascertaining severability in Newton v. City of Tuscaloosa, 251 Ala. 209, 217, 36 So.2d 487, 493 (1948):
"'... The act "ought not to be held wholly void unless the invalid portion is so important to the general plan and operation of the law in its entirety as reasonably to lead to the conclusion that it would not have been adopted if the legislature had perceived the invalidity of the part so held to be unconstitutional. " A. Bertolla & Sons v. State, 247 Ala. 269, 271, 24 So.2d 23, 25 [(1945)]; Union Bank & Trust Co. v. Blan, 229 Ala. 180, 155 So. 612 [(1934)]; 6 R.C.L. 125, § 123.
"(Emphasis added.)
[[Image here]]
" '... It is also to be said, in the nature of limitation of the rule stated, that the whole statute will be stricken if the valid and invalid parts are so connected and interdependent in subject-matter, meaning, and purpose that it cannot be presumed that the Legislature would have passed the one without the other, or where the striking of the invalid would cause results not contemplated or intended by the lawmakers, or where that invalid is the consideration or inducement of the whole act, or where the valid parts are ineffective and unenforceable in themselves, according to the legislative intent.’
"[Springer v. State ex rel. Williams, 229 Ala. 339,] 342-43, 157 So. [219,] 222 (1934) (emphasis added). See also City of Birmingham v. Smith, 507 So.2d 1312, 1317 (Ala.1987), describing the test 'as whether the legislature would have enacted the statute without the void provision. ’ ’
(Final emphasis added.) See also Robert L. Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L.Rev. 76, 76 (1937), explaining that
"the United States Supreme Court, the state courts, and secondary authorities all appear to agree that the test for whether the invalidity of part of a law or of some of its *532 applications will not affect the remainder is ‘(1) if the valid provisions or applications are capable of being given legal effect standing alone, and (2) if the legislature would have intended them to stand with the invalid provisions stricken out.' ”

. For that matter, it has existed in history since ancient times. See, e.g., Charles P. Kin-dregan, Jr., Same-Sex Marriage: The Cultural Wars and the Lessons of Legal History, 38 Fam. L.Q, 427, 428 (2004) (noting that ‘‘[t]he Code of Hammurabi, 1780 B.C., provided that ‘if a man take a wife and does not arrange with her the proper contracts, that woman is not his legal wife’ ”).

. The issue in Lofton was whether a Florida statute prohibiting adoption by practicing homosexuals violated the equal-protection and due-process rights of homosexual persons desiring to adopt. The United States Court of Appeals for the Eleventh Circuit determined that no fundamental right to private sexual intimacy existed and, thus, that the Florida statute was subject to rational-basis analysis. It was significant to the Eleventh Circuit in Lofton that “the involved actors are not only consenting adults, but minors as well.” 358 *534 F.3d at 817. Such is the case with the underlying action before the Mobile Probate Court.

. Compare DeBoer, 772 F.3d at 400 (observing that "[o]nly the Supreme Court may overrule its own precedents, and we remain bound even by its summary decisions 'until such time as the Court informs [us] that [we] are not’ ” and that "[t]he Court has yet to inform us that we are not” to follow Baker), with Baskin v. Bogan, 766 F.3d 648, 660 (7th Cir.2014) (stating that "Romer v. Evans, 517 U.S. 620, 634-36, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); Lawrence v. Texas, 539 U.S. 558, 577-79, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), and United States v. Windsor are distinguishable from the present two cases but make clear that Baker is no longer authoritative”).

. The Searcy I plaintiffs might respond that defining marriage inherently as available only to members of the opposite sex is also circular, but that argument ignores the fact' that millennia of practice stand behind the traditional definition. Such a mistake is similar to an employee’s complaining that his boss cannot tell him what to do because no one informed him that being an employee meant that he would have to do what someone else told him to do. To state that being an employee means that a person works for someone else is not circular reasoning: it is just describing the nature of an "employee.” Likewise, as will be explained more fully in the text below, to state that being married involves two people of the opposite sex joining in a special relationship is not circular: it merely describes the nature of being "married.”

.This not-so-subtle redefinition of "marriage” is an example of what law professor Steven D, Smith calls "smuggling,” which "implies that an argument is tacitly importing something that is left hidden or unacknowledged — some undisclosed assumption or premise." Steven D. Smith, The Disenchantment of Secular Discourse 35 (2010). Smith goes on to explain that such a tactic is "illicit” when making the undisclosed premise
"explicit would be controversial: you would have to' defend the premise, andyou don't want to do that. Or your premise might be illicit because you yourself do not believe it: you like your conclusion, maybe, but you don’t actually believe what would be necessary to support this particular argument for that conclusion. Perhaps, if you were to make your unstated premise explicit, you would be convicted of inconsistency, because you have contradicted that premise on other occasions. Or your premise might be illicit because the conventions of the discourse you are engaging in purport to exclude it.”
Id. at 36.
In this instance, the first two reasons Smith offers for ."smuggling” are the most likely to apply. Proponents of the new definition of marriage do not want to have to defend the premise behind their change of definition because doing so would necessarily require the introduction of legislation to effect the change rather than a court order. Also, as is explained in note 31 and the accompanying text, the new definition of marriage put forward by proponents of same-sex marriage carries im *536 plications that proponents themselves either do not believe or do not want explicitly revealed at this time because they know that a large majority of the populace is not ready to accept those implications.

. See also Goodridge v. Dep’t of Pub. Health, 440 Mass. 309, 365-66, 798 N.E.2d 941, 984 (2003) (Cordy, J., dissenting):
"This feat of reasoning succeeds only if one accepts the proposition that the definition of the institution of marriage as a union between a man and a woman is merely ‘conclusoiy’ ..., rather than the basis on which the ‘right’ to partake in it has been deemed to be of fundamental importance. In other words, only by assuming that ‘marriage’ includes the union of two persons of the same sex does the court conclude that restricting marriage to opposite-sex couples infringes on the ‘right’ of same-sex couples to ‘marry.’ ”

. The Bostic Court, among others, asserted that "Glucksberg’s analysis applies only when courts consider whether to recognize new fundamental rights” and that including same-sex couples in the right to marry does not create a new right, and so, conveniently, it did not matter that there is no historical tradition of same-sex marriage. 760 F.3d at 376. The Bostic Court noted that the Supreme Court did not contend that it was creating a new fundamental right to interracial marriage when it struck down Virginia’s miscegenation statute as unconstitutional in Loving. Id. at 376-77. This point ignores the fact that the Loving Court did not need to create a new *537 fundamental right in order to subject Virginia’s statute to strict-scrutiny analysis because the statute discriminated on the basis of race, which is an express suspect classification in the Fourteenth Amendment.

. In contrast to the assertion that marriage is "wholly secular,” plaintiffs in some actions seeking to nullify state laws limiting marriage to its traditional understanding have contended that those laws violate the Establishment Clause of the First Amendment to the United States Constitution. See, e.g., Love v. Beshear, 989 F.Supp.2d 536, 541 (W.D.Ky.2014); Brenner v. Scott, 999 F.Supp.2d 1278, 1284 (N.D.Fla.2014); Love v. Pence, (No. 4:14-CV-00015-RLY-TA, Sept. 16, 2014) 47 F.Supp.3d 805 (S.D.Ind.2014).
So which is it? Is marriage a purely civil institution or is it a hybrid of religious and civil acknowledgments of a relationship? So far no court has declared that laws recognizing that marriage exists only between a husband and wife violate the Establishment Clause. Presumably, the issue thus far has been avoided at least in part because the notion that traditional marriage laws violate the Establishment Clause borders on the absurd. Just recently, the United States Supreme Court concluded that the practice of opening legislative meetings with prayer does not violate the Establishment Clause solely because the same practice occurred during the period the First Amendment was framed and ratified. See Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). It seems safe to assume that the Founders similarly perceived no Establishment Clause problem with state marriage laws.
Regardless of the chance of succeeding on such a claim on its merits today, the fact that some proponents of same-sex marriage now contend that traditional marriage laws violate the Establishment Clause suggests that some of the same precepts upon which the proponents rely in the current debate may be renewed in arguments over successive issues yet to come.

. As has been noted, the United States Supreme Court stated in Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888), that marriage is “the most important relation in life,” id. at 205, and that it is "the foundation of the family and of society, without which there would be neither civilization nor progress," id. at 211.

. Judge Cordy in his dissenting opinion in Goodridge observed:
“Casting the right to civil marriage as a ‘fundamental right’ in the constitutional sense is somewhat peculiar. It is not referred to as such in either the State or Federal Constitution, and unlike other recognized fundamental rights (such as the right to procreate, the right to be free of government restraint, or the right to refuse medical treatment), civil marriage is wholly a creature of State statute. If by enacting a civil marriage statutory scheme [a state] has created a fundamental right, then it could never repeal its own statute without violating the fundamental rights of its inhabitants.”
440 Mass. at 366 n. 3, 798 N.E.2d at 985 n. 3 (Cordy, J., dissenting).
The DeBoer Court provided an extensive explanation as to why categorizing the right to marry as fundamental in the constitutional sense
"makes little sense with respect to the trials and errors societies historically have undertaken (and presumably will continue to undertake) in determining who may enter and leave a marriage. Start with the duration of a marriage. For some, marriage is a commitment for life and beyond. For others, it is a commitment for life. For still others, it is neither. In 1969, California enacted the first pure no-fault divorce statute. See Family Law Act of 1969, 1969 Cal. Stat. 3312. A dramatic expansion of similar laws followed. See Lynn D. War-dle, No-Fault Divorce and the Divorce Conundrum, 1991 BYU L.Rev, 79, 90. The Court has never subjected these policy fits and starts about who may leave a marriage to strict scrutiny.
"Consider also the number of people eligible to marry. As late as the eighteenth century, '[t]he predominance of monogamy was by no means a foregone conclusion,’ and ‘[m]ost of the peoples and cultures around the globe’ had adopted a different system. Nancy F. Cott, Public Vows: A History of Marriage and the Nation 9 (2000). Over time, American officials wove monogamy into marriage's fabric. Beginning in the nineteenth century, the federal government ‘encouraged or forced’ Native Americans to adopt the policy, and in 1878 the Supreme Court upheld a federal antibigamy law. Id. at 26; see Reynolds v. United States, 98 U.S. 145, 8 Otto 145, 25 L.Ed. 244 (1878). The Court has never taken this topic under its wing. And if it did, how would the constitutional, as opposed to policy, arguments in favor of same-sex marriage not apply to plural marriages?
“Consider finally the nature of the individuals eligible to marry. The age of consent has not remained constant, for example. Under Roman law, men could marry at fourteen, women at twelve. The American colonies imported that rule from England and kept it until the mid-1800s, when the people began advocating for a higher minimum age. Today, all but two States set the number at eighteen. See Vivian E. Hamilton, The Age of Marital Capacity; Reconsidering Civil Recognition of Adolescent Marriage, 92 B.U. L.Rev. 1817, 1824-32 (2012). The same goes for the social acceptability of marriage between cousins, a union deemed 'desirable in many parts of the world’; indeed, around '10 percent of marriages worldwide are between people who are second cousins or closer.’ Sarah Kershaw, Living Together: Shaking Off the Shame, N.Y. Times (Nov. 25, 2009)_ Even in the United States, cousin marriage was not prohibited until the mid-nineteenth century, when Kansas — followed by seven other States — enacted the first ban. See Diane B. Paul & Hamish G. Spencer, ‘It's Ok, We're Not Cousins by Blood': The Cousin Marriage Controversy in Historical Perspective, 6 PLoS Biology 2627, 2627 (2008). The States, however, remain split: half of them still permit the practice. Ghassemi v. Ghassemi, 998 So.2d 731, 749 (La.Ct.App.2008). Strict scrutiny? Neither Loving nor any other Supreme Court decision says so.”
DeBoer v. Snyder, 772 F.3d 388, 412-13 (6th Cir.2014)(emphasis omitted).
These observations take issue with the United States Supreme Court’s designation of marriage as a fundamental constitutional right. Perhaps the strongest recommendation for this view is the simple fact that the United States Constitution does not mention marriage. Indeed, the Supreme Court has observed that "the states, at the time of the adoption of the Constitution, possessed full power over the. subject of marriage and divorce ... [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce.” Haddock v. Haddock, 201 U.S. 562, *539 575, 26 S.Ct. 525, 50 L.Ed. 867 (1906), overruled on other grounds, Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942).
Saying that marriage is not a fundamental Constitutional right would not demean its importance because "something can be fundamentally important'without being a fundamental right under the Constitution.” DeBoer, 772 F.3d at 411. It would simply mean that the Constitution does not dictate policy on the matter.

, See Lawrence, 539 U.S. at 578 ("The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. ■ The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to *540 engage in their conduct without intervention of the government.”).

. For that matter, if love is the defining criterion for marriage, then why must it be limited to marriage between two persons who are both adults, or for that matter between two persons? Where is the definitional limitation in such a criterion? What other limitations that we assume will continue to be true of marriage would logically yield to this criterion?

. See DeBoer, 772 F.3d at 404 ("One starts from the premise that governments got into the business of defining marriage, and remain in the business of defining marriage, not to regulate love but to regulate sex, most especially the intended and unintended effects of male-female intercourse.”).

.One need only consider paternity to name one obvious example of the ways in which marriage organizes social relations. See, e.g., Lehr v. Robertson, 463 U.S. 248, 263, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (noting that "[t]he most effective protection of the putative father's opportunity to develop a relationship with his child is provided by the *541 laws that authorize formal marriage and govern its consequences”).

. In a footnote of its opinion, the federal district court rejected several of these purposes of traditional marriage laws — the history and tradition of marriage, encouraging responsible procreation, promoting optimal child-rearing — as not constituting "compelling” state interests by simply citing Bostic v. Schaefer, 760 F.3d 352 (4th Cir.2014). Bostic sidelined the importance of these purposes of marriage by taking the view that marriage is not jiist about procreation; rather it is concerned with the happiness of a relationship between two adults. See Bostic, 760 F.3d 352, 380 ("[T]he Supreme Court rejected the view that marriage is about only procreation in Griswold v. Connecticut, in which it upheld married couples' right not to-procreate and articulated a view of marriage that has nothing to do with children.”). There are at least three problems with this tactic.
First, no one is saying that "marriage is about only procreation.” Bostic, 760 F.3d at 380 (emphasis added). The State is simply stating that a primary public purpose of marriage concerns procreation and that this is sufficient justification to make a distinction in law as to the types of couples who can marry. The fact that marriage encompásses more than procreation does not by itself invalidate procreation as an interest in the State’s marriage policy. ■
Second, the decision in Griswold was not based on a “right to marry”; it was based on a right to privacy. See Griswold, 381 U.S. at 486 ("We deal with-a right of privacy older than the Bill of Rights — older than our political parties, older than our school system.”) As with the discussion above about Lawrence, the problem in Griswold was government’s interference with an intimate aspect of an existing relationship, in which the Griswold Court clearly was referring to the traditional marriage relationship. (Why else would contraception even be an issue?) The issue here concerns the government’s public recognition of a relationship that until 2002 was unknown in history as being categorized as "marriage.”
Third, the Bostic Court's cavalier rejection of the purposes of traditional-marriage fails to acknowledge that the Court made a moral judgment that the new definition of marriage is superior to the traditional view. As Steven Smith has noted:
“[H]ow can we argue about the desirability or justice of restrictions on abortion, or marriage, or drug use, without somehow drawing upon our larger vision of the good life, and upon the religious or philosophical assumptions that give rise to and inform those visions? It is a large question. But the short answer, it seems, is that we cannot.”
Steven D. Smith, Disenchantment, at 105. The Bostic Court’s opinion is replete with moral assertions made as statements of fact:
"[S]ame-sex couples [arguably] want access to marriage so that they can take advantage of its hallmarks, including faithfulness and permanence, and that allowing loving, committed same-sex couples to marry and recognizing their out-of-state marriages will strengthen the institution of marriage.”
760 F.3d at 381.
"[T]he Proponents imply that,.by marrying, infertile opposite-sex couples set a positive example for couples who can have unintended children, thereby encouraging them to marry.”

*544
id.

"[B]y preventing same-sex couples from marrying, the Virginia Marriage Laws actually harm the children of same-sex couples by stigmatizing their families.... ”
Id. at 383.
Regardless of whether one agrees or disagrees with these assertions, the fact remains that they represent the imposition of the Bostic (and Searcy I) Court’s moral views upon the State under the guise of legal reasoning. It is not reasoning of "a”-plus "b” equals "c”; it is the declaration' of social policy through judicial flat under the guise of constitutional law.

. "Human beings are created through the conjugation'of one man and one woman. The percentage of human beings' conceived through non-traditional methods is minuscule, and adoption, the form of child-rearing in which same-sex couples may typically participate together, is not an alternative means of creating children, but rather a social backstop for when traditional biological families fail. The perpetuation of the human race depends upon traditional procreation between men and women. The institution developed in our society, its predecessor societies, and by nearly all societies on Earth throughout history to solidify, standardize, and legalize the relationship between a man, a woman, and their offspring, is civil marriage between one man 'and one woman.”
Sevcik v. Sandoval, 911 F.Supp.2d 996, 1015 (D.Nev.2012).

. The DeBoer Court noted:
"Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), holds that a State may require law enforcement officers.to retire without exception at age fifty, in order to assure the physical fitness of its police force. If a rough correlation between age and strength suffices to.uphold exception-free retirement ages (even though some fifty-year-olds swim/bike/run triathlons), why doesn’t a correlation between male-female intercourse and procreation suffice to uphold traditional marriage laws (even though some straight couples don’t have kids and many gay couples do)?”
DeBoer, 772 F.3d at 407.

. One commentator characterizes the Court’s approach in these cases as amounting to name-calling on a scholarly level:
"Typically, judicial decisions invalidating challenged laws ultimately boil down to peremptory assertions by judges that the law in question has no 'rational basis' or is the product of prejudice or 'animus.’ Thus, citing ‘a substantial number of Supreme Court decisions, involving a range of legal subjects, that condemn public enactments as being expressions of prejudice or irrationality or invidiousness,' Robert Nagel shows how 'to a remarkable extent, our courts have become places where the name-calling and exaggeration that mark the lower depths of our political debate are simply given more acceptable, authoritative form.’ ”
Steven D. Smith, The Disenchantment of Secular Discourse, 9 (2010) (quoting Robert F. Nagel, Name-Calling and the Clear Error Rule, 88 Northwestern Univ. L.Rev. 193, 199 (1993)).

. This is what one law professor has deftly labeled “ ‘The Not-Nice School of Constitutional Law,’ ” by which he meant that “the Constitution is taken simply to prohibit any state or federal action that is not nice. Whatever the text may actually provide, this school transforms it into an engine of political wish-fulfillment. What we don’t like in government, the Constitution outlaws.” Craig A. Stern, Things Not Nice: An Essay on Civil Government, 8 Regent U.L.Rev. 1, 2 (1997). See also Robicheaux v. Caldwell, 2 F.Supp.3d 910, 925 (E.D. La. 2014) (“The federal court decisions thus far exemplify a pageant of empathy; decisions impelled by a response of innate pathos. Courts that, in the words of Justice Scalia in a different context in Bond v. United States, — U.S. —, —, 134 S.Ct. 2077, 2094, 189 L.Ed.2d 1 (2014) (concurring opinion), appear to have assuméd the mantle of a legislative body.”).

. As already noted, the Supreme Court’s substantive-due-process cases require "a ‘careful description’ of the asserted fundamental liberty interest.” Glucksberg, 521 U.S. at 720-21 (quoting Reno, 507 U.S. at 302).

. The Lawrence Court stated that "this Court's obligation is to define the liberty of all, not to mandate its own moral code.” Lawrence, 539 U.S. at 559. Interestingly, in her special writing in Lawrence, Justice O'Connor stated: "Unlike the moral disapproval of same-sex relations — the asserted state interest in this case — other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.” Lawrence, 539 U.S. at 585 (O’Connor, J., concurring in the judgment)(emphasis added).

. The Windsor Court also stated that DOMA "places same-sex couples in an unstable position of being in a second-tier marriage." — U.S. at -, 133 S.Ct. at 2694. Justice Scalia responded:
"It takes real cheek for today's majority to assure us, as it is going out the door, that a constitutional requirement to give formal recognition to same-sex marriage is not at issue here — when what has preceded that assurance is a lecture on how superior the majority’s moral judgment in favor of same-sex marriage is to the Congress’s hateful moral judgment against it. I promise you this: The only thing that will ‘confine’ the Court’s holding is its sense of what it can get away with.”
— U.S. at -, 133 S.Ct. at 2709 (Scalia, J„ dissenting, joined by Thomas, J.).

. Several courts have inveighed that people’s moral or religious views of marriage can have nothing to do with the legality of the institution. See, e.g., Baskin v. Bogan, 766 F.3d 648, 669 (7th Cir.2014) ("To be the basis of legal or moral concern ... the harm must be tangible, secular, material — physical or financial, or, if emotional, focused and direct— rather than moral or spiritual.... Similarly, while many heterosexuals (though in America a rapidly diminishing number) disapprove of same-sex marriage, there is no way they are going to be hurt by it in a way that the law would take cognizance of.”); Varnum v. Brien, 763 N.W.2d 862, 905 (Iowa 2009) ("State government can have no religious views, either directly or indirectly, expressed through its legislation.... As a result, civil marriage must be judged under our constitutional standards of equal protection and not under religious doctrines or the religious views of individuals.”); Kerrigan v. Comm'r of Pub. Health, 289 Conn. 135, 251, 957 A.2d 407, 475 (2008) ("Because, however, marriage is a state sanctioned and state regulated institution, religious objections to same sex marriage cannot play a role in our determination of whether constitutional principles of equal protection mandate same sex marriage.”); Goodridge v. Dep’t of Pub. Health, 440 Mass. 309, 312, 798 N.E.2d 941, 948 (2003) ("Many people hold deep-seated religious, moral, and ethical convictions that marriage should be limited to the union of one man and one woman, and that homosexual conduct is immoral. Many hold equally strong religious, moral, and ethical convictions that same-sex couples are entitled to be married, and that homosexual persons should be treated no differently than their heterosexual neighbors. Neither view answers the question before us.”). ■
This divorce of moral and religious ideas from legal debate is now common:
"In [the classical] view, the function of moral reasoning is to determine what actions, or what kind of life, conform to a normative order inherent in nature itself. ... A good deal of thinking about suicide, and about moral questions generally, still operates on some such assumption. In much public discourse, however, and especially in academic and legal contexts, explicit appeals to normative dimensions in nature are typically deemed inadmissible. Moral reasoning is supposed to operate without reliance on religious or metaphysical premises.”
Smith, Disenchantment, at 60.

: "The secular philosophical tradition - speaks of inalienable rights, inalienable human dignity and of persons as ends in themselves. These are, I believe, ways of whistling in the dark, ways of trying to make secure to reason what reason cannot finally underwrite.” Raimond Gaita, A Common Humanity: Thinking About Love and Truth and Justice . 5 (Routledge 2000) (1998).

. "[T]here is no apparent reason why anyone • should be persuaded [by intuitions]. After all, what credentials can these intuitions claim? Whether intuitions are reliable is, of course, always a question, but in this case the problem goes deeper: it is not at all clear exactly what the intuitions are even, about. Suppose I do have a ‘mora! intuition (whatever that is) that, say, polygamous relationships are ‘wrong’ (whatever that means). So what? I may also harbor an obsessive fear of traveling on airplanes, or an abiding premonition that something horrible will happen if I leave the house on Friday the thirteenth, or a sense of profound disgust when I look down at my plate and see that the peas have gotten mixed with the potatoes. Unless these feelings, intimations, or intuitions are grounded in something rational and objectively real, the proper response in each case, it seems, would be therapeutic in nature; it would be a response calculated to help me and anyone else subject to such debilitating feels and intuitions ‘Get over it!’
“Conversely, insofar as contemporary deontological thinkers forego therapeutic response and instead treat such intuitions with utmost respect, it is hard to resist the suspicion that they are acting on lingering assumptions — their own, possibly, or perhaps those of the people whose intuitions provide them with their material — about an intrinsic normative order.”
Smith, Disenchantment, at 66 (footnotes omitted).

. "Acceptance of the broad description requires rejection of two salient aspects of the narrow description of marriage. First, it requires rejecting the notion that marriage is no more than what the narrow model describes. Although genderless marriage proponents rarely, if ever, expressly state that notion of ‘no more than,’ the notion is always implicit in their arguments.103 Second, .the broad description also requires rejecting the idea that children are not ‘the sine qua non of civil marriage’ and that ‘marriage and children are not really connected.’ The broad description portrays marriage as primarily a child-protective and child-centered institution, with most of the institution’s social goods pertaining to the quality of child-rearing. Conversely, the narrow model describes an adult-centered ‘partnership entered into for its own sake, which lasts only as long as both partners are satisfied with the rewards (mostly intimacy and love) that they get from it.’
[[Image here]]
"103 .,. This phenomenon merits close examination for two reasons. First, the notion itself goes to the heart of the veracity of the narrow and broad descriptions; if the ‘no more than’ notion is factually accurate, it must follow that what the broad description depicts beyond the narrow description’s scope is factually false. Conversely, if the ‘no more than’ notion is erroneous as a matter of fact, that error would be established by the validation of the broad description’s additional depictions. Second, if — as demonstrated elsewhere — the ‘no more than’ notion is always or nearly always implicit and therefore not expressly stated and defended, that aspect is also important. Id. It is important because it constitutes probative evidence about how defensible the ‘no more than’ notion is,”
Monte Neil Stewart, Marriage Facts, 31 Harv. J.L. & Pub. Pol’y 313, 337-38 (2008) (most footnotes omitted; emphasis omitted).

. According to the National Conference of State Legislatures, only 11 states have accept *552 ed same-sex marriage as a result of choices made by the people or their elected representatives. The 26 other states that, to any extent, now have same-sex marriage do so because it has been imposed on them by court order (21 of these by federal courts). See http://www.ncsl.org/research/human-services/ same-sex-marriage-laws.aspx# 1 (last visited March 2, 2015; a copy of the Web page containing this information is available in the case file of the Clerk of the Alabama Supreme Court).

 Note from the reporter of decisions: On March 12, 2015, the Alabama Supreme Court issued an order stating, in part, "[h]aving received no meritorious showing by any of the additional respondents as to why he or she should not be bound in the same manner as the named respondents and Judge Davis, all respondents continue to be bound by the order of this Court.”

. The decision of the federal district court in Strawser was premised on its earlier decision in Searcy v. Strange, 81 F.Supp.3d 1285 (S.D.Ala.2015).